343 So.2d 1090 (1977)
HUGH O'CONNOR, INC.
v.
J. ROBERT AUTENREITH, INC. and Plumbers and Steamfitters Local 60 Home Association, Inc.
No. 7732.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 1977.
On Rehearing March 15, 1977.
Writ Refused May 5, 1977.
*1091 Rene A. Pastorek, Gretna, for plaintiff-appellant.
Dodd, Barker, Boudreaux, Lamy & Gardner, C. Paul Barker, New Orleans, for defendant-appellee.
Before BOUTALL, SCHOTT and BEER, JJ.
SCHOTT, Judge.
This suit grew out of a building contract between Plumbers and Steamfitters Local 60 Home Association, Inc. (Plumbers) as owner and Hugh O'Connor, Inc. (O'Connor) as general contractor, for the construction of a union hall and training school. The owner's architect was Mathes, Bergman, Favrot and Associates, Inc. (Bergman) and the mechanical subcontractor was J. Robert Autenreith, Inc. (Autenreith).
On April 7, 1969, a standard AIA form of agreement was signed between Plumbers and Bergman for the design of the building and for the usual architectural services in connection with employing a contractor and administering the contract. On September 4, 1970, Bergman issued an invitation for bids on the project which included the following:
"Mechanical work: The General Contractor is not to obtain bids for mechanical work. The Owner will furnish the General Contractor with an estimate for accomplishing the mechanical work which he is to include in his proposal."
On September 11, 1970, Bergman notified all prospective bidders that they were to use Autenreith's bid to perform the mechanical work at a price of $173,856. On September 18 the building contract was signed between Plumbers and O'Connor for a price of $727,300. On October 6 a subcontract was entered into between Autenreith and O'Connor for the mechanical work at Autenreith's price of $173,856.
On September 10, 1971, as the work on the project neared completion Autenreith requested that Bergman release the 10% retainage on his subcontract. Autenreith stated that there was an agreement between it and Plumbers to do the mechanical work at Autenreith's cost with the understanding that a fee would be negotiated *1092 between Plumbers and Autenreith upon completion of the job. Bergman then wrote Plumbers as follows:
"We have a letter from Mr. J. Robert Autenreith in connection with the retainage which is being held on the work accomplished by his firm in the new building. Due to the fact that he is doing this on a cost basis and any fees to be paid to him would be negotiated between you and his firm, we feel that the retainage is certainly not necessary. . . ."
Bergman went on to recommend that the retainage be released as Autenreith requested. On September 24 Bergman notified O'Connor that he might include in his requisition for that month the full amount due Autenreith without regard to the usual retainage. On September 27 Autenreith submitted to O'Connor a request for payment of the $17,385.60 retainage. But on September 29 O'Connor addressed the following letter to Bergman:
"With reference to your letter of September 24, we would be happy to release the retainage held on the contract with J. Robert Autenreith, Inc. except for the fact that we have been notified by letter and by telephone from two of Mr. Autenreith's subcontractors that they have not been paid and holding us responsible for this payment, as is the law.
"However, if you would contact the Owners and have them send us a letter releasing us and our bonding company, Highlands Insurance Company, from any possible liens or claims on this job from Autenreith's subcontractors or material suppliers, we will release this retainage immediately.
"I'm sure you can appreciate the fact that it is necessary to insist on this protection since we are potentially liable to all material suppliers on the job, particularly when they have formally put us on notice of non-payment."
In response to that letter on October 5, Bergman said that there was no reason to have retainage on the Autenreith contract since the contract between Plumbers and Autenreith was for cost. The letter concluded:
"We are perfectly willing to release you and your bonding company from any liens or claims in connection with Autenreith's subcontractors or materials suppliers."
On November 5, 1971, Bergman wrote Plumbers referring to his earlier recommendation that the retainage on Autenreith's contract be released. Bergman stated that he had been at that time aware of two claims by Autenreith's suppliers but he was now aware of many other items due by Autenreith totaling in excess of the amount due Autenreith by O'Connor. The letter concluded as follows:
"In our letter of October 5, to Hugh O'Connor Company in which we stated that joint checks would be made to Autenreith and his material suppliers we stated that we were willing to release O'Connor Company and their bonding company from any liens and claims in connection with the subcontracts or material suppliers. This statement was made in connection with the retainage on the contract only and inasmuch as this retainage has not been released to O'Connor Company we should withdraw the statement entirely. Previously in this letter we stated that the retainage should be withheld for a complete accounting and we also feel that it should be withheld due to the possibility of any misunderstanding concerning the release of O'Connor or their bonding company and any obligations."
Autenreith defaulted and ended up in bankruptcy but the retainage was never paid by O'Connor despite the discussions among the parties. Autenreith's work was completed by O'Connor subject to an agreement between O'Connor and Plumbers under which the parties reserved their rights to determine who would be ultimately responsible for the excess cost of the work originally undertaken by Autenreith. This appeal is from a judgment dismissing O'Connor's suit against Plumbers.
*1093 O'Connor contends that there was a separate contract for the mechanical work between Autenreith and Plumbers and relies on De Lambre v. Williams, 36 La.Ann. 330 (1884) as authority for the proposition that it is not liable for Autenreith's default under the circumstances. O'Connor further contends that Bergman in his letter of October 5, 1971, gave O'Connor a release which was either then binding on Plumbers or subsequently ratified by Plumbers.
At the trial of the case the testimony of Edward J. Bertoneau, President of Plumbers, J. Robert Autenreith and others was admitted over the objection of counsel for Plumbers in an attempt by O'Connor to show that there was a separate contract for the mechanical work. The trial judge did not make a specific factual determination as to whether there was such a contract or not, but he nevertheless distinguished the case from the De Lambre case on its facts. From our review of the record we have concluded that the evidence is insufficient to establish that there was such a separate contract between Autenreith and Plumbers.
The evidence shows that Autenreith and Plumbers had a close relationship for many years prior to Plumbers' decision to construct the Union hall and school. Autenreith testified that in his discussions with Bertoneau he agreed to do the mechanical work at his cost because of the "prestige of doing it" and because he wanted to help the local Union. He qualified this testimony to the extent of the following answer given by him in response to a question as to whether or not there was to be a fee paid to his company at the conclusion of the job:
"Well, this is a nebulous thing and it's probably a very poor way of doing business, but I told Eddie that we would do it at cost and after the job was over if we could save any money perhaps we could get a small fee out of it and/or maybe out of the money that was left in our original estimate. I think that's it. To the best of my ability that was the conversation and it ended there."
On the other hand, Bertoneau testified that Autenreith's figure was firm and that there was no understanding that any fee would be paid whether Autenreith's cost estimate proved to be accurate or not. Asked whether he had agreed to reimburse Autenreith in the event that there was an overrun in his costs, Bertoneau replied that he could not make such a commitment without going back to the local Union, presenting it to them and explaining why. He stated that everything he did was subject to the approval of the local Union.
In argument that there was a separate contract between Autenreith and Plumbers, O'Connor relies especially on the letter sent by Autenreith to Bergman on September 10 which began: "As you know our agreement with Local 60 is to furnish and install Plumbing and Heating on the referenced project at our cost. Upon completion of the job, a fee would be paid to us that would be negotiated between Mr. Bertoneau and ourselves."
When Autenreith was asked to explain this letter he pointed out, first, that the letter was not written by him but by a Mr. Green of his organization, and second, that the letter was "improperly phrased." Asked what was a more accurate way to put it, Autenreith replied:
"Well, actually we were going to develop the entire cost of the project and if we saved some money perhaps we could get something out of it and if we didn't save it, then we still were going to do it at cost. That was my understanding with Bertoneau. But as far as an actual fee, or percentage, or anything else, we never did discuss that."
When Bertoneau was confronted with the letter from Autenreith on the witness stand he denied having seen it at the time, and with respect to Bergman's letter of September 10 to Plumbers in which the same thought was expressed to Bertoneau he testified that he ignored that part of Bergman's letter because he was satisfied that Autenreith had quoted a firm figure not at all subject to future negotiation.
Autenreith's uncorroborated testimony that there was some "nebulous" understanding that if Autenreith accomplished *1094 the work for much less than his estimated cost Plumbers might receive a reimbursement and Autenreith might be paid some fee out of the excess funds is not sufficient to establish a valid building contract between the two corporations. The evidence preponderates to the effect that Autenreith furnished Plumbers a firm bid to do this work with the understanding of everyone concerned that his company would be the exclusive mechanical subcontractor on this job for the amount of the bid. All contractors bidding on this project were free to use the Autenreith bid any way they saw fit. For instance, O'Connor added Autenreith's bid to his other costs before figuring his percentage of overhead and profit on the job. While Autenreith's bid excluded the cost of a performance bond in O'Connor's favor, nothing precluded the latter from adding this to its own costs. O'Connor was at no disadvantage in comparison with other bidders but voluntarily accepted Autenreith as a subcontractor when it submitted its bid for the general contract.
The distinction between this case and the De Lambre case relied upon so heavily by O'Connor is in the facts. In the cited case the Supreme Court found as in the instant case that the costs of the engineer's work and the carpenter's work were in the general contract, but referring to a stipulation fixing the value of those two elements the court said: "From the tenor of the stipulation itself, and from other evidence, it appears clearly to our minds that they formed no part of defendant's contract . . ." Thus, in De Lambre, there were separate contracts between the owner, on the one hand, and the engineer and carpenter, on the other, but in the instant case there was a firm contract between O'Connor and Plumbers which included the mechanical subcontract of Autenreith and the facts do not support the existence of a separate contract between Plumbers and Autenreith for the performance of this work.
O'Connor's next contention is to the effect that a release binding upon Plumbers was given to it by Bergman in his capacity as agent for Plumbers in the letter of October 5 in which Bergman stated: "We are perfectly willing to release you and your bonding company from any liens or claims in connection with Autenreith's subcontractors or materials suppliers."
Before dealing with this contention we must first consider how matters stood among the parties when the letter was written. A valid, enforcible contract existed between O'Connor to perform the mechanical work subcontracted by it to Autenreith. One of O'Connor's obligations was to protect Plumbers from liens by suppliers of labor and material. If a release was contemplated, what consideration was given for such a release by O'Connor? We can conceive of none and therefore regard O'Connor's argument as an attempt to enforce a gratuitous remission of its obligation to Plumbers. See LSA-C.C. Art. 2199 et seq.
C.C. Art. 2997 provides that an agent's power must be express and special for a number of purposes including the power to compromise. Surely it must also be express and special for the power to grant a gratuitous remission of a debt.
Furthermore, the letter from O'Connor to Bergman on September 29, which elicited the October 5 response, indicated by its own terms that O'Connor was aware that a release would have to come from the owners specifically requesting that Bergman "contact the Owners" for the release.
Finally, O'Connor relies on C.C. Art. 3000:
"Powers granted to persons, who exercise a profession, or fulfill certain functions, or doing any business in the ordinary course of affairs to which they are devoted, need not be specified, but are inferred from the functions which these mandataries exercise."
It was Bergman's function to administer the terms of the contract between O'Connor and Plumbers. The article can hardly be construed to include among Bergman's functions the right to grant a remission to O'Connor with respect to obligations which were undertaken when the contract was entered into.
*1095 However, O'Connor contends that Bergman's actions in releasing O'Connor was ratified by Plumbers. O'Connor relies on Fred G. Jones & Co. v. Sanford, 163 La. 799,112 So. 726 (1927) and McNeely v. Dave Lumber Co., 18 La.App. 672, 137 So. 607 (2nd Cir. 1931) as authority for the proposition that where an agent exceeds his authority it is the duty of the principal to disavow the agent's actions or suffer himself to be bound. We have already observed that the alleged release by Bergman would be more in the nature of a gratuitous remission and we question whether the doctrine of implied ratification has any application, but pretermitting that question, the facts do not provide a basis for the application of the doctrine.
O'Connor contends that Plumbers had knowledge of Bergman's letter in early October, 1971, from conversations between Bergman and Bertoneau. O'Connor points to the language used by Bergman in the letter of November 5 to the effect that "we should withdraw" the statement made to O'Connor in the October 5 letter to the effect that the release would be given to O'Connor and the surety. However, the trial court found that Plumbers first became aware of the purported release on November 5, thereby accepting Bertoneau's unequivocal testimony that Bergman did not tell him about the letter of October 5 and the first knowledge that he had of any problems was after Autenreith had defaulted.
The evidence shows that there were problems with two of Autenreith's subcontractors as of September 29, and when Bergman wrote his letter of October 5 he was aware of these two subcontractors and no more. At that time he did not have any reason to believe that Autenreith could not perform the contract. Around the middle of October, Autenreith suffered a heart attack and his problems followed in rapid succession, so that by November 5 Bergman realized the seriousness of Autenreith's situation. Bertoneau admitted that he read Bergman's letter of November 5 and did nothing to respond because he considered the problem would be handled between the architect and the mechanical contractor. O'Connor contends that Plumbers' failure upon receipt of that November 5 letter from Bergman to repudiate Bergman's act of releasing O'Connor raised the presumption that Plumbers ratified the release and therefore approved O'Connor's contention to the effect that Bergman granted on Plumbers' behalf a release in favor of O'Connor.
But by November 5 Autenreith had already defaulted and it now was an accomplished fact that O'Connor would have to complete the mechanical work on the contract. Many of the claims by Autenreith's subcontractors had already surfaced and the parties were now aware of them. It would not be reasonable for O'Connor to believe that Plumbers was willing to ratify a release of O'Connor under these circumstances.
O'Connor's argument is essentially that C.C. Art. 3010 applies. This provides as follows:
"The attorney can not go beyond the limits of his procuration; whatever he does exceeding his power is null and void with regard to the principal, unless ratified by the latter, and the attorney is alone bound by it in his individual capacity."
Under the circumstances prevailing on November 5 we cannot see any basis for holding that Plumbers intended to ratify Bergman's release which would have been tantamount to dispensing O'Connor from performing its remaining obligations under a binding contract when Plumbers derived no benefit whatsoever.
Accordingly, the judgment appealed from is affirmed at plaintiff's cost.
AFFIRMED.
BEER, J., concurs with written reasons.
BEER, Judge, concurring.
I reluctantly concur for I do not agree with the majority's conclusion that: "The evidence preponderates to the effect that *1096 Autenreith furnished Plumbers a firm bid to do this work . . . ."
My reading and rereading of the record causes me to reach a different conclusion. In my view, the actual agreement between Autenreith and the Plumbers was a De Lambre v. Williams type arrangement.
However, the able trial judge made factual findings which he describes as "distinguishable" from De Lambre v. Williams, and I cannot conscientiously substitute my judgment for his, for I cannot say that he has manifestly erred.
I feel that the facts clearly describe a moral obligation on the part of the Plumbers to reimburse O'Connor even if same is not technically supportable in a strict legal sense.

ON REHEARING
SCHOTT, Judge.
We granted O'Connor's application for rehearing in which it urges that De Lambre v. Williams, 36 La.Ann. 330 (1884) cannot be distinguished from this case. It argues that our statement that the evidence is insufficient to establish a separate contract between Autenreith and Plumbers is inconsistent with our findings that Autenreith furnished Plumbers a firm bid to do the mechanical work with the understanding of everyone concerned that Autenreith would be the mechanical subcontractor on the job for the amount of the bid.
It is true that a contract was made between Autenreith and Plumbers to the effect that if, as and when Plumbers found a general contractor to undertake the construction of its building at a price which Plumbers would agree to pay, Autenreith would be the designated subcontractor for the mechanical work at the price Autenreith had submitted. This is not to say that Plumbers at any time entered into a building contract with Autenreith to do the mechanical work.
A building contract arose between O'Connor and Plumbers when Plumbers accepted the offer made by O'Connor to construct the building based on the plans and specifications prepared by Bergman at the price which O'Connor submitted. O'Connor's offer included a stipulation in favor of Autenreith as a third person. LSA-C.C. Art. 1980, Planiol, vol. 2, Nos. 1210-1267. This stipulation was ratified by Autenreith when the subcontract was executed between it and O'Connor. Planiol, vol. 2, Nos. 1251-1253.
Thus, Autenreith did not make a separate building contract with Plumber as did the engineer and the carpenter with the owner in De Lambre v. Williams.
The result we have reached is consistent with that reached in Schultz v. Gund, 19 So.2d 682 (La.App.Orl.1944). There the owner's architect received a bid from Holzer Sheet Metal Works to install a heating system prior to confection of a building contract between Schultz, the owner, and Gund, the contractor. Subsequent to the signing of the contract Holzer's bid was accepted. The system did not function in accordance with the expressed guarantee in the contract between Schultz and Gund which provided: "The above system is to be guaranteed to keep the building at 70 F. dry bulb temperature." After the failure was discovered there were numerous contacts between the owner and Holzer with the latter recognizing its obligation and making attempts to remedy the defects. The court found that the owner could recover damages from the contractor under these circumstances, saying:
"Before we consider the question of damages sustained by plaintiff, we notice a point which has been raised by the defendant, Gund, and his surety. It is contended in their behalf that, since the bid of the Holzer Company was received by Mr. Sporl, the architect, and the heating system installed directly by the Holzer Company and not under the supervision of the contractor, the latter is not responsible. We cannot see any force whatever in this contention. Gund made a contract with the plaintiff to erect his residence in accordance with certain plans and specifications; these plans and specifications provided for a heating system; Gund was *1097 paid for the installation of this system and is therefore responsible for the damages sustained under the building contract. The fact that he permitted the architect to deal directly with the subcontractor is unavailing to him as a defense."
For these reasons and those assigned in our original opinion, our judgment on original hearing is hereby reinstated. Plaintiff is to pay all costs.
ORIGINAL JUDGMENT REINSTATED. AFFIRMED.
BEER, J., concurs with written reasons.
BEER, Judge, concurring.
I concur for the reason that I believe that the majority has correctly applied the law to a factual situation which has support in the record even though my own appraisal of the factual situation is somewhat different from the majority view.
I believe that Hugh O'Connor, Inc. was, to a greater extent than that found by my brothers, in a De Lambre v. Williams situation. Thus, the result reached by the majority seems harsh to me. Yet, I cannot say that it is incorrect on the factual findings that form the basis for their holding, nor can I say that the factual findings to which they subscribe are unsupported by the record.