hSAUNDERS, Judge,
concurring in part and dissenting in part.
I agree with the conclusions of the majority that the trial judge erred in applying La.R.S. 22:230.2 retroactively. Clearly, the statute was enacted subsequent to the effective date of the Louisiana Blue Cross policy. Nevertheless, in the interest of justice, I feel that a remand is warranted so that the trial court could consider whether the Oregon insurer acted as an agent for the Louisiana carrier or is otherwise culpable for its actions.
|2The problem with the Louisiana policy, and the basis of the present dispute, is that the Louisiana policy the Guillots eventually obtained had a limit of de minimis value in comparison to the Oregon plan which left plaintiff and her husband underinsured.[1] As it turned out, the Blue Cross of Louisiana policy for which they paid premiums of $700.00 every three months only provided coverage of $10,000.00 per illness and $20,000 per lifetime, far less than the $500,000.00 policy they had in Oregon and the coverage they thought they had purchased in Louisiana.
These numbers are shocking and one cannot review these without recognizing that a great injustice has taken place. Can anyone believe that the plaintiffs went to such trouble to obtain only $10,000.00 of medical insurance? Without a doubt they wanted and negotiated for the $500,000.00 policy which they had in effect in Oregon. Can anyone believe that they agreed to pay $2,800.00 for *97 only $10,000.00 of insurance? Such a proposition is indefensible. Clearly they bargained for $500,000.00 of insurance and thought they were paying for $500,000.00 of insurance. Something is wrong in the State of Oregon and, yes, something is wrong in the State of Louisiana. What is wrong in the State of Oregon is that a giant of the insurance industry has skillfully relieved itself of liability for catastrophic medical bills which, had the plaintiffs not moved to Louisiana, it would unquestionably have had to pay. What is wrong in the State of Louisiana is that Blue Cross of Oregon is not before this court and unless an agency or alter ego theory of liability can be established, the courts of this state will have to countenance this most unconscionable travesty!
13As is correctly pointed out by the majority, the plaintiffs had no direct contact with Blue Cross of Louisiana, with whom this policy was being negotiated and, accordingly, the only way plaintiffs claim for medical expenses might remain viable would require Blue Cross of Louisiana to be proven responsible for plaintiffs losses, even if indirectly, 1.e., through a theory of agency or alter ego representation of Blue Cross of Oregon. The trial judge did not consider these issues, notwithstanding the evidence tending to suggest this possibility, due to his erroneous conclusion that La.R.S. 22:230.2 must be read into the Guillots’ policy. In my view, these issues remain viable and I would remand this case in order to have the trial court review the evidence and rule on these issues.
According to plaintiffs husband, he and his wife, Marilyn Guillot, had hoped to return home in 1991 to their native Louisiana to complete their retirement.[2] At the time of the contemplated move, the Guillots were insured by Health Maintenance Organization of Oregon, Mr. Guillot’s group insurer through his former employer. Before moving, Mr. Guillot, a retired truck driver, contacted the HMO, a Blue Cross of Oregon subsidiary, to confirm that their Blue Cross insurance would continue in force following their move to Louisiana. Mr. Guillot was determined to prevent the couple’s medical insurance from lapsing, knowing that his spouse’s history of serious medical ailments, very expensive medical procedures (two angioplasties among others), and equally poor prognosis meant that obtaining a new insurance policy in Louisiana would be impossible.
According to Mr. Guillot’s version of events, he first discussed these concerns with Ms. Linda Rask, a Health Maintenance Organization of Oregon (HMOO) who _j4indicated that in order for the couple to maintain their coverage, he and his wife would have to first transfer their Oregon HMO coverage to a traditional policy with Blue Cross of Oregon, the HMO’s parent, then transfer that coverage to Blue Cross of Louisiana. Thereafter, Blue Cross of Oregon’s representative, Ms. Kim Wirtz, contacted Mr. Guillot and likewise assured him that the couple would lose little or no coverage in the move.
Mr. Guillot contends that he never discussed the couple’s coverage needs directly with Blue Cross of Louisiana personnel, but rather that Oregon personnel took care of the couple’s every need. This account could well be true, given Blue Cross of Louisiana’s lack of documentation to contradict Mr. Guil-lot’s version of events and the Louisiana carrier’s apparent reception of the couple’s transfer via “wires” from Oregon Blue Cross. These are the words Mr. Guillot used to describe his conversations with Ms. Wirtz, which occurred sometime between his September 1991 conversation with Ms. Rask and the Guillot’s October 1991 move to Louisiana:
A. She told me. She says, Mr. Guillot, you go ahead and make your move and, she said, you will be covered by us. I said, fine. And she says, I’ll discuss it with you, you know, from time to time, which she did. She called me two or three times to talk to me. I went ahead and I made the move, and she told me, she said, I’m going to give you a letter stating that you are covered, all your benefits will *98 be transferred in, you know, into Louisiana, if we transfer you.
While Blue Cross of Oregon concedes that Ms. Wirtz and Mr. Guillot had conversed several times during the period in question and that he had ample reason to be concerned that his wife’s coverage not be permitted to lapse, it steadfastly maintains that Ms. Wirtz had never informed Mr. Guillot that the couple would retain coverage more or less equivalent to that offered them in Oregon. Quoting Ms. Wirtz’s testimony on the subject:
IsA. My primary roles was to obtain the special approval needed to move him from HMOO conversion to Blue Cross [of Oregon] and Blue Shield’s conversion at his choice of level benefits.
Q. So you would have never given him what benefits were available in Louisiana?
A. -That’s absolutely true.
Q. From Conversion J.
A. I would have made no comparison because I have no knowledge to their benefits.
Ms. Wirtz also ruled out anyone else’s intervention in Oregon:
Q. How would Mr. Guillot have obtained that particular application he forwarded to Louisiana?
A. I have no knowledge of that.
Q. Is it possible that somebody else from Oregon would have forwarded Mr. Guillot the conversion application that we see here?
A. No. We have no other [state’s] forms on file in our company.
In view of the foregoing, it is conceivable (though by no means certain) that Blue Cross of Louisiana could be held accountable for the actions of its Oregon counterpart. While Ms. Wirtz’s testimony suggests that she had told Mr. Guillot that his insurance would be different, it also suggests that Blue Cross knew of the importance the Guillots placed on their continued coverage in Louisiana and the likely difficulty of obtaining coverage here. Specifically, Ms. Wirtz testified as follows:
Q. During that conversation, or any conversation, did you and Mr. Guillot discuss that the benefits under the [Oregon Blue Cross] conversion plan were limited?
A. Every conversation we had, we went over that. The first conversation, I indicated to him that it was going to be a dramatic difference from his HMO conversion which was a co-payment situation rather than a scheduled benefit, and that the first thing he should do when he gets ... got to Louisiana was to contact an |6insurance professional here to look for other benefits because the conversion would not be adequate. First and foremost, it didn’t offer any outpatient benefits.
Q. Did he ever indicate to you that ... what his concern was about obtaining insurance for his wife?
A. Absolutely. She had a pre-existing condition that he felt if they applied for regular benefits on the open market that they wouldn’t be able to qualify for them.
Q. From your experience in the underwriting field, is that statement correct?
A. Absolutely, in Oregon.
Additionally:
Q. Based on your knowledge of Mr. Guil-lot ... Mrs. Guillot’s condition, there was no way she would have been able to obtain coverage because both the pre-existing condition and riders would have excluded coverage for illness.
A. That would be true in Oregon. The assumption is that that would be true elsewhere.
Q. Okay. From your knowledge of the insurance industry, other insurance companies contain limitations on coverage such as preexisting conditions?
A. Yes, they do.
The record suggests the possibility that the finder of fact might conclude that the Blue Cross of Oregon personnel acted as agents for the Louisiana insurer.
*99 An agent is defined as one who acts for or in the place of another by authority from the latter. La.C.C. art. 2985 et seq.; Craft v. Trahan, 351 So.2d 277 (La.App. 3rd Cir.1977), writ denied 353 So.2d 1336 (La. 1978). An actual agency relationship may be either express or implied. For some acts an agent’s authority must be express. This is true for the agent to buy, sell, contract a loan, acknowledge a debt, draw or endorse promissory notes, and generally where the acts to be done are not merely those of administration or such as facilitate such acts. La.C.C. art. 2997; Hugh O’Connor, Inc. v. J. Robert Autenreith, Inc., 343 So.2d 1090 (La.App. 4th Cir. 1977), writ denied 345 So.2d 59 (La.1977).
Pesson v. Kleckley, 526 So.2d 1220, 1225 (La.App. 3 Cir.1988). See also, Tedesco v. Gentry Development, Inc., 540 So.2d 960 (La. 1989)(sale of immovable property). Support for such a conclusion could be drawn from the history of dealings between the Blue Cross insurers, or from the transactions at issue in this case between the Oregon and Louisiana Blue Cross companies.[3]
While the concepts of express and implied authority apply mainly to questions of liability arising between a principal and its agent and situations where a third party claims no detrimental reliance on the acts of either party, Broadway v. All-Star Insurance Corporation, 285 So.2d 536 (La.1973), Blue Cross of Louisiana conceivably could be held liable to plaintiffs by virtue of its having vested Blue Cross of Oregon with apparent authority.
Apparent authority is a doctrine by which an agent is empowered to bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction, although the principal has not actually delegated this authority to the agent. Restatement (Second) of Agency Sec. 8 (1958); W. Seavey, Law of Agency Sec. 8(D) (1968); F. Mechem, Law of Agency Sec. 84 (4th ed.1952); Comment, Agency Power in Louisiana, 40 Tul.L.Rev. 110 (1965) [hereinafter cited as Comment, Agency Power]. In an actual authority situation the principal makes the manifestation first to the agent; in an apparent authority situation the principal makes this manifestation to a third person. However, the third person has the same rights in relation to the principal under either actual or apparent authority. Further, apparent authority operates only when it is reasonable for the third person to believe the agent is authorized and the third person actually believes this. Restatement, supra Sec. 8, comments a and c.
There is no express codal or statutory authority for the doctrine of apparent authority in Louisiana. This doctrine of unprivileged agency power, however, is an important part of the modern law of agency. A. Yiannopoulos, Civil Law in the Modern World 88 (1965).
Louisiana courts have utilized the doctrine of apparent authority to protect third persons by treating a principal who has manifested an |8agent’s authority to third persons as if the principal had actually granted the authority to the agent. See Restatement, supra Sec. 8, comment d; Comment, Agency Power, supra; Conant, The Objective Theory of Agency: Apparent Authority and the Estoppel of Apparent Ownership, 47 Neb.L.Rev. 678 (1968).
Tedesco, 540 So.2d at 963.
There would appear to be some uncertainty in some instances as to whether a party seeking to rely on the doctrine of apparent authority must establish that the reliance induced a change of position. See Tedesco, 540 So.2d at 964:
The Louisiana decisions have sometimes used language of estoppel, but have not distinguished between the concepts of apparent authority and agency by estoppel. The Restatement, however, makes a clear distinction. According to the Restatement, apparent authority is based on the objective theory of contracts that a party ought to be bound by what he says and manifests *100 rather than by what he intends, so that a third person who contracts with an agent need only prove reliance on the appearance of authority manifested by the principal. Because an enforceable contract results from the agreement with the agent after the principal’s conduct has manifested his consent, the third person need not prove any change of position induced by the reliance. On the other hand, agency by estop-pel is based on tort principles of preventing loss by an innocent person. The third person not only must show reliance on the conduct of the principal, but also must show such a change of position on his part that it would be unjust to allow the principal to deny the agency. Restatement, supra Sec. 8, comment d.
íi» V *1* ^
Nevertheless, in this case there is no question that plaintiffs premium payments to Blue Cross of Louisiana and the insurer’s failure to pay benefits constitutes such a change in position. “Change of position includes payment of money, expenditure of labor, suffering of loss, or subjection to legal liability in reliance on the belief of agency.” Id., at 965. Consequently, “[i]n the present ease, it is not necessary for this court to consider adopting a distinction between the doctrines of apparent authority and agency by estoppel.” Id.
Accordingly, in the case at bar, it is conceivable that the Louisiana carrier could be bound by the actions of its “sister company” although plaintiffs had little ifjgany direct contact with Blue Cross of Louisiana, depending on whether Oregon Blue Cross’s actions or inactions “gave the erroneous impression that third parties dealing with [Blue Cross of Oregon] were dealing with [Blue Cross of Louisiana, the principal],” Independent Fire Ins. v. Able Moving, 94-1982 (La.2/20/95), at p. 6, 650 So.2d 750, 752, or whether Blue Cross of Louisiana had vested its Oregon sister with contractual (ie., express) or implied authority to act in its behalf.
While the constitutional authority of appellate courts and the need for judicial economy encourage our reaching the merits wherever justified, Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975), that discretion must be employed prudently.
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzales should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a firsthand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial.
Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980)(emphasis added).
Iioln my view, this is such a case. Inasmuch as the Oregon carriers already have been dismissed from these proceedings with prejudice, in accordance with Ragas, I would remand in order that the trial court could determine whether the agency theory is applicable in this case with respect to Blue Cross of Louisiana.[4]

. There is no question but that the Guillots were forced to terminate their health insurance coverage with the Oregon HMO since the HMO's coverage did not extend beyond a several county area, let alone beyond Oregon state's boundaries. Nonetheless, according to the Guillots, at least two Oregon representatives, Linda Rask of the Oregon HMO, and Kim Wirtz of Blue Cross of Oregon, advised that if the Guillots transfer their policy from the Oregon HMO to Blue Cross of Oregon, this would not result in reduced coverage.

. Plaintiff herself was unable to testify at trial as a consequence of severely disabling brain lacerations and multitudinous medical complications arising from an automobile accident in which she was involved in 1987.

. The record contains evidence of one direct communication between the two insurers, a “faxed wire” between them dated May 5, 1992 concerning the Guillots' insurance.

. By way of example only, wholly apart from the agency theory, plaintiff could conceivably demonstrate that Blue Cross of Louisiana is liable for the actions of its Oregon counterpart under an alter ego theory. See, e. g., Green v. Champion Ins. Co., 577 So.2d 249, 257-258 (La.App. 1 Cir.), writ denied, 580 So.2d 668 (La.1991). As with the agency question, the record before us does not contain adequate evidence to confirm whether the two Blue Cross companies share more than their names, but the question must arise by virtue of Louisiana Blue Cross's willing *101 ness to accept responsibility for "new" insurance applicants so clearly demonstrating a high risk of exposure.