Saul F. LEWIS, et al., Appellants,

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, et
al., Appellees.

No. 80–1330.

District of Columbia Court of Appeals.

Argued Feb. 9, 1983.

Decided June 29, 1983.

Stanley M. Karlin, Bethesda, for appellants.

Laurence T. Scott, Washington, D.C., for appellees.

Before KERN, MACK and FERREN, Associate Judges.

KERN, Associate Judge:

This is an appeal from the trial court's denial of appellants' motions for a new trial or for judgment notwithstanding the verdict in their negligence action against the Washington Metropolitan Area Transit Authority ("WMATA") and Dravo Corporation ("Dravo"), owner and builder, respectively, of the subway system in the District of Columbia.

I

Appellants[1] are the owners of a building which for approximately fifty years has been leased to the Boyce & Lewis, Inc. shoe store ("Boyce & Lewis"). In 1974, while subway construction was in progress along the street facing appellants' building, the owner and manager of Boyce & Lewis, a Mr. Gilbert Tebeleff, noticed some structural cracks in the building. Mr. Tebeleff showed these cracks to representatives of WMATA and Dravo, who had estimates made of the cost to repair the damage. In July 1976, a check was issued by the insurer for WMATA and Dravo, payable to Boyce & Lewis, for $9,675 (Record at 40), most of which represented the then-estimated cost to repair the cracks in the building. In exchange for the check for $9,675, Mr. Tebeleff signed a release discharging WMATA and Dravo from any further liability on that same claim for damages. (Record at 154a.)

Approximately two years later, however, the cracks in appellants' building appeared to have widened substantially, and the front of the building appeared to have moved. Mr. Tebeleff, this time joined by one of the owners of the building, met with representatives of WMATA and Dravo to discuss the damages; and a new estimate was prepared showing the cost of repairing the cracks at that time to be $94,000. (Supp. Record at 62.) WMATA and Dravo subsequently refused to pay for the repairs, relying on the release and contending that there had been no new damage, merely a progression of the earlier damage for which compensation had already been paid. It was not until this point, according to appellants, that they as owners had any notice that a release had been executed by Mr. Tebeleff, the manager of Boyce & Lewis, the tenant in appellants' building. (Supp. Record at 9–10.)

Following the refusal by WMATA and Dravo to pay for the repairs, appellants brought this action against them, alleging that they negligently failed to maintain adequate support for appellants' building during the subway excavation. (Record at 1–3.) WMATA and Dravo asserted in defense that the damage for which payment was claimed was not caused by negligence; that it was not new and was therefore covered by the release; and that the release was valid and binding against appellants, because Mr. Tebeleff of Boyce & Lewis was empowered to execute the release in their behalf.[2] During the course of the trial,

---

1. Appellants Saul F. Lewis, Tillie B. Lewis, Harry Friedman, and Rae Friedman are partners, doing business under the name L & F Company.

2. The record is not clear as to what precise legal theory was urged by appellees in asserting the validity of the release. Although it is apparent that some general application of

when Dravo was shown to be an independent contractor, the trial court dismissed WMATA from the suit. After trial, the jury returned a general verdict in favor of the appellee, Dravo.

Appellants now maintain that the trial court erred in denying their motion for judgment notwithstanding the verdict as to Dravo because there was insufficient evidence of an agency relationship between the owners of the building and Mr. Tebeleff to permit the jury to consider the validity of the release. Appellants also assert reversible error in (a) the trial judge's failure to instruct the jury that the appellee bore the burden of proving the existence of an agency relationship; and (b) the trial judge's instruction to the jury that any violations of the building code [3] were only evidence of negligence and not negligence *per se.*

Although we conclude that there was sufficient evidence from which the jury could have found that the manager of Boyce & Lewis, Mr. Tebeleff, was authorized to execute the release binding appellants, we reverse because of the trial court's failure to instruct the jury as to appellees' burden of proof on the issue of agency.

## II

A judgment notwithstanding the verdict should be granted only when the evidence, viewed in the light most favorable to the nonmoving party, permits only one reasonable conclusion as to the proper judgment. *Faniel v. Chesapeake & Potomac Telephone Co.,* 404 A.2d 147, 150 (D.C.App. 1979); *McKnight v. Wire Properties, Inc.,* 288 A.2d 405, 406 (D.C.App.1972). Where

the evidence is such that reasonable persons could differ, the issue is properly put before the jury. *Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C.App.1982). In this case, the evidence before the jury was such that reasonable persons could have reached different conclusions as to implied authority or ratification. Thus, contrary to appellants' assertion, it is not clear, as a matter of law, that the release did *not* bind appellants; and the motion for judgment notwithstanding the verdict was properly denied.

Implied authority is actual authority inferred from the circumstances, such as the relationship between the parties and conduct of the principal toward the agent manifesting the principal's consent to have the agent act for him. W. SEAVEY, AGENCY § 8, at 11–13 (1964); *Scott v. Purcell,* 490 Pa. 109, 113 n. 8, 415 A.2d 56, 60 n. 8 (1980); *Czarnecki v. Plastics Liquidating Co.,* 179 Conn. 261, 265, 425 A.2d 1289, 1293 (1979).[4]

In this case, it was shown that Boyce & Lewis was only a tenant in appellants' building, that the owners had ultimate responsibility under the lease for repairing any damages to the building, that the owners did not receive the 1976 payment when it was made, and that the release signed by Mr. Tebeleff in the name of Boyce & Lewis did not refer to L & F Company or to the individual owners. However, there was also testimony that Mr. Tebeleff had been a friend of at least one of the owners for thirty years (Supp. Record at 23); and the copy of the lease which the jury had before it showed that two of the lessor-owners of the building were also the only signatory lessees (and therefore were apparently Mr. Tebeleff's employers).[5] (Record at 154.)

---

agency law was contemplated, the basis of neither party's position was carefully delimited at trial. However, the evidence at trial and the arguments of counsel were consistent with principles of both implied actual authority and ratification.

3. D.C.Mun.Regs. tit. 5A–1, §§ 1304, 1306 (1982) were admitted into evidence.

4. "[A]uthority to do an act can be created by written or spoken words or other conduct of

the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." RESTATEMENT (SECOND) OF AGENCY § 26 (1958). The manifestation of the principal may consist of his failure to object to acts of the agent when he normally would be expected to do so. *Id.,* comment d.

5. Tillie B. Lewis signed the lease as president of Boyce & Lewis, and Saul F. Lewis signed it as secretary of Boyce & Lewis. There is no evi-

In addition, there was testimony from one of the owners that he had been aware of the construction in the street in front of their building since 1973 or 1974 (Supp. Record at 12); that he knew (although it is not clear exactly when) that various payments for some type of damages had been made by WMATA and Dravo to Mr. Tebeleff as early as 1975 (Supp.Record at 17–18); that he knew Mr. Tebeleff was "handling" all negotiations with WMATA and Dravo (Supp.Record at 27); and that, so long as the building "was being kept up," he had not been concerned with the details of the claims and settlements. (Supp.Record at 18.)

Mr. Tebeleff similarly testified that, prior to signing the release in question, he had called one of the owners several times to tell him that he had "straightened out" matters with, and accepted payments from, WMATA and Dravo,[6] sometimes not even describing the exact damages incurred. (Supp.Record at 57.) He stated that he had "handled all the other things prior to [the 1976 settlement for structural cracks]" (Supp.Record at 69), and further:

I was handling everything as I thought best. . . . [From] time to time I said . . . this was done or that was done. It was all taken care of. I didn't really feel it was necessary to say any more to them, over the period of years that I had been in the business and associated with them. They had confidence in what I was doing. (Supp.Record at 64.)

■ Also, Mr. Tebeleff's action in placing the 1976 payment from WMATA in a bank account for the owners (Supp.Record at 57), raises the inference that he thought he was acting as agent for the owners, since an agent is obliged to keep his principal's money in a safe place. *See Robbins v. Roumel*, 138 A.2d 922, 923 (D.C.Mun.App. 1958). Although the owners and Mr. Tebeleff disclaimed any express grant of authority (Supp.Record at 7, 57, 75), and although one of the owners testified that he never knew about any damage to the building until 1978 and had assumed the payments Mr. Tebeleff was collecting were for damage to Boyce & Lewis property (Supp.Record at 18, 25), the evidence at trial was sufficient to permit reasonably conflicting inferences as to whether the owners, by their failure to object, had manifested their consent to delegate broad authority to Mr. Tebeleff to handle negotiations for them with WMATA and Dravo, whatever the nature.[7]

dence in the record that this apparent interrelationship between the lessee company and the lessors did not exist during the time period in question.

6. On at least one earlier occasion, WMATA and Dravo had paid Boyce & Lewis for damages which were clearly damages to the building, not to Boyce & Lewis property. In the record on appeal is a copy of a check for $722.35, dated December 24, 1975, which corresponds with a receipt for that same amount for the repair and replacement of cracked masonry walls and windows. (Record at 47–48.) The record on appeal is also replete with copies of estimates and receipts provided to Boyce & Lewis for such items as roof and gutter repairs, brickwork, and replacement of air conditioning equipment. It is not clear whether these items were ever admitted into evidence; however, Mr. Tebeleff's testimony indicated he had handled these kinds of repairs. (Supp.Record at 47–48.)

7. The doctrine of implied actual authority focuses upon the *agent's* understanding of his authority: whether the agent reasonably believed, because of conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act. W. SEAVEY, *supra*, § 18, at 33; *see* footnote 4, *supra*. The doctrine of apparent authority, by contrast, focuses upon the *third party's* understanding of the agent's authority: whether the third party reasonably relied upon conduct of the principal (including acquiescence) or conduct of the agent for which the principal is responsible. W SEAVEY, *supra*, §§ 8, 18, at 13, 33. In their brief and at oral argument, appellants framed the issue in this case as one of apparent authority and maintained that the evidence of an agency relationship was insufficient because (a) the appellee failed to produce any witnesses from WMATA or Dravo claiming that they believed Mr. Tebeleff had authority to act for appellants, and (b) appellants had provided appellee with a copy of the lease agreement setting forth their relationship with Mr. Tebeleff. Although this contention has merit, it ignores the fact that the parties did not limit themselves to any one specific

■ The same evidence also permits the inference that this grant of authority was so broad as to authorize Mr. Tebeleff to handle negotiations and accept payments for repairs to the building, and within the framework, to execute the release in question. Ordinarily, authority to execute a release must be specially conferred, 2A C.J.S. *Agency* § 235 (1972); and an agent with authority to collect payments for his principal is generally without authority to compromise the debt owed the principal.[8] However, an agent may have the authority to compromise or settle a claim if he is a general agent [9] or has an extremely broad grant of management authority. 2A C.J.S. *Agency* § 233 (1972); *see Davis v. Casey, supra.* Under circumstances similar to these in the instant case, other courts have held principals bound by releases executed by their agents.[10] In this case, Mr. Tebeleff and one of the owners testified that Tebeleff was "handling everything" over a period of years and had such confidence of the owners that they did not always require him even to report the details of negotiations and settlements to them. Their testimony, viewed in light of the extended personal, and likely employment (*see, infra* at 666), relationship between the parties, was sufficient to permit a reasonable inference that Tebeleff was a general agent or had a grant of management authority broad enough to include authority to execute the release in question.

■ Even if the evidence of implied authority for Mr. Tebeleff to execute the release were inadequate, there was sufficient evidence to put the question of ratification to the jury.[11] Although an agent may not be authorized to do a certain act, if the principal, with knowledge of the act, acquiesces in it, by allowing the agent to do similar acts, or by retaining the benefits of the act when it was done in service to him, then the past unauthorized act is ratified. W. SEAVEY, AGENCY §§ 21, 38, at 39, 73

theory of agency at trial, and the fact that the evidence supported a finding of implied actual authority or ratification. *See* footnote 2, *supra.*

8. *See Davis v. Casey,* 70 U.S.App.D.C. 27, 103 F.2d 529, 535 (1939); *e.g., H. O'Connor, Inc. v. J.R. Autenreith, Inc.,* 343 So.2d 1090, 1094–95 (La.Ct.App.1977) (gratuitous remission, by agent, of debt owed principal must have been specially authorized); *Kalevas v. Ferguson,* 216 Ala. 625, 114 So. 292 (1927) (real estate agent authorized to receive payments from tenant had no implied authority to execute release from lease); *Wichita Frozen Food Lockers v. National Cash Register Co.,* 142 Tex. 109, 176 S.W.2d 161 (1943) (authority to take orders for purchase of goods, subject to principal's approval, does not carry implied authority to accept return of used goods in cancellation of debt owed to principal).

9. "A general agent is an agent authorized to conduct a series of transactions involving a continuity of service." Restatement (Second) of Agency § 3 (1958).

10. *E.g., Lincoln Bank v. National Life Insurance Co.,* 476 F.Supp. 1118, 1122–23 (E.D.Pa. 1979) (agent had signed similar releases previously; but evidence also showed that she would sign almost anything she was given and that principal had poorly supervised her dealings with third parties); *Mayrath Co. v. Helgeson,* 258 Iowa 543, 139 N.W.2d 303 (1966) (settlement binding where agent acted as general manager, had confidence of principal, regularly settled claims, and was not required to discuss settlements with principals, although he sometimes did so); *Steen v. Andrews,* 223 Miss. 694, 78 So.2d 881 (1955) (general manager of used car lot with broad authority to conduct the business for absent owner had authority to settle claim); *Robertson Canning Co. v. Davis,* 15 S.W.2d 882 (Mo.App.1929) (general agent who negotiated contracts for principal, made settlements, and was never questioned by principal had authority to execute compromise contract). These cases involved apparent and implied authority.

11. In a similar, very early case, the appellate court for the District of Columbia did not limit a party asserting an agency relationship to a theory of implied authority when the evidence supported a ratification theory as well. *See Pittsburg [sic] Construction Co. v. Gannon,* 46 App.D.C. 131, 134–35 (1917). In the instant case, whatever legal theory the jury may have applied to the facts in evidence, the emphasis at trial was more generally focused on acts of the principal implying either consent to give Mr. Tebeleff authority or adoption of his prior acts.

(D.C.1964).[12] The principal may ratify the act expressly or impliedly, by conduct inconsistent with any other hypothesis, *Greyvan Lines v. Nesmith,* 50 A.2d 434, 437 (D.C. Mun.App.1946); and once he has done so he is bound by the agent's act *nunc pro tunc. Wittlin v. Giacalone,* 84 U.S.App.D.C. 140, 171 F.2d 147, 148 (1948); *Dorothy K. Winston & Co. v. Town Heights Development, Inc.,* 376 F.Supp. 1214, 1216 (D.D.C.1974). The agent must have purported to act on behalf of the principal; however, he need not have represented to the third party that he was authorized to act for the principal. *Dodge Engineering Associates v. Noland Co.,* 128 A.2d 655, 657 (D.C.Mun.App.1957); *Slater v. Berlin,* 94 A.2d 38, 42 (D.C.Mun. App.1953).

■ In the instant case, Mr. Tebeleff testified that he was acting for the owners, *i.e.,* he deposited the money paid to him on the claim with a bank because it belonged to the owners. (Supp.Record at 57–58, 70–71.) He testified further that part of the money was eventually used by the owners to finance this litigation. (Supp.Record at 71.) There was no evidence that, when the owners learned of the settlement, including the fact that a release had been executed, they tendered the payment back to WMATA and Dravo. This evidence is sufficient to support the conclusion that the owners retained the benefits of the negotiations that Mr. Tebeleff conducted on their behalf. *See Rustler's Steak House v. Environmen-*

*tal Associates, Inc.,* 327 A.2d 536, 538–39 (D.C.App.1974) (third party's check, sent in compromise negotiated with agent, constituted accord and satisfaction when cashed by principal).[13] Moreover, in view of the close and long-standing relationship between Mr. Tebeleff and the owners, and the evidence of their being in communication, the jury might reasonably have found incredible the testimony that the owners did not know about the 1976 settlement payment and release until 1978, and may have concluded that the owners acquiesced in Mr. Tebeleff's decision.

Accordingly, we find no error in the trial court's denial of appellants' motion for judgment notwithstanding the verdict.

### III

However, the trial court committed reversible error in declining to instruct the jury that the burden of proving the agency relationship rested with appellees. As the party asserting agency, appellee sought to benefit from a finding that Mr. Tebeleff's release bound the owners; appellee thus affirmatively had to demonstrate the relationship.

After the trial judge had finished instructing the jury, but before the jury retired, appellants' counsel asked the court to give additional instructions on the burden of proof with respect to agency.[14]

---

**12.** "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act ... is given effect as if originally authorized by him." Restatement (Second) of Agency § 82 (1958). "Affirmance" includes conduct justifiable only if there were an election to treat the act as authorized. *Id.,* § 83.

**13.** *See also Mayrath Co. v. Helgeson, supra* (check in settlement of account became accord and satisfaction when cashed and proceeds retained, not tendered back); *Tom Huston Peanut Co. v. Black,* 221 Ala. 375, 129 So. 58 (1930) (principal bound where agent had been in communication, and where payment in settlement had been accepted by principal).

**14.** Appellants' counsel did not submit a written request for instructions on burden of proof in advance, as permitted under Super.Ct.Civ.R. 51. Some courts, in applying the identical federal rule, have held that the grant of an oral request, made after instructions have been given, is discretionary because the request is untimely. *E.g., Pinto v. States Marine Corp. of Delaware,* 296 F.2d 1, 4 (2d Cir.1961) (Friendly, J.), *cert. denied,* 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); *see* 5A J. MOORE, MOORE'S FEDERAL PRACTICE 51.03, at 51–3 (1982); 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2552, at 626 (1971); 2 E. DEVITT & C. BLACKMAR, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 7.02, at 205–06 (1977). However, Rule 51 expressly prohibits a party from assigning as error the failure to give an instruction only when the party has not objected before the jury

(Supp.Record at 375–76.) The court denied the request, explaining: "I don't think it is proper for me to say that the burden of proof, as far as the release is concerned, is upon the defendant." (Supp.Record at 376.)

It is well settled that, where the evidence permits reasonably conflicting inferences, as here, the existence of agency, and its nature and extent, are questions of fact; and the party relying upon the agent's authority to bind his principal bears the burden of proving that the agent's act was authorized initially or *nunc pro tunc* by ratification. *Edmund J. Flynn Co. v. La-Vay,* 431 A.2d 543, 548 (D.C.App.1981); *H.G. Smithy Co. v. Washington Medical Center,* 374 A.2d 891, 893 (D.C.App.1977); *Rustler's Steak House v. Environmental Associates, supra,* 327 A.2d at 539. A party is entitled to instructions concerning the burden of proof, particularly in a case such as this where the evidence is close and largely circumstantial. 75 AM.JUR.2d *Trial* § 754, at 674 (1974); 88 C.J.S. *Trial* § 308, at 823 (1955); *e.g., Sheppard Federal Credit Union v. Palmer,* 408 F.2d 1369, 1372 (5th Cir. 1969); *Ralston Purina Co. v. Parsons Feed and Farm Supply,* 364 F.2d 57 (8th Cir.1966) (reversing in part for trial court's failure to instruct regarding burden of proving an agency relationship asserted as an affirmative defense).

In this case, we cannot conclude that the trial court's failure to give the requested instruction was harmless error (1) because of the close and conflicting evidence on implied authority and ratification; (2) because we cannot know whether the jury's general verdict for appellees rested upon a finding of no negligence, or a finding that the release was valid against appellants; and (3) because the trial court's general instructions that the appellants had the burden of proving their case (Supp.Record

at 361), may have misled the jury as to the burden of proof on the validity of the release.

## IV

Finally, for the guidance of the parties, we briefly address the issue raised as to the propriety of the trial judge's instructions concerning possible violations of the District of Columbia building code.

During the course of trial, §§ 1304 and 1306 of the building code, *supra,* footnote 3, were admitted into evidence. Section 1304.2 provides (in pertinent part) that "[a]ll excavations shall be protected by sheet piling or shares in accordance with the requirement of the Minimum Wage and Industrial Safety Board's Construction Safety Standards . . . ." Section 1306.1(1) provides (in pertinent part) that "[e]very portion of every structure in process of construction . . . and all neighboring property and structures . . . shall be sufficiently supported and protected by the building owner performing such operation . . . ."

When these two code sections were offered into evidence, counsel for the appellees argued that they were intended to cover only building construction and did not apply to the underground tunneling and vent shaft construction involved in the negligence claim in this case. Appellants responded simply by pointing out that the two code sections were broadly worded and that WMATA is required by its charter to follow all the laws of the District of Columbia. The trial judge, in the exercise of his discretion, admitted the two provisions into evidence, but in so doing, stated: "I think [appellant's argument] is stretching it. . . . It seems to me that there ought to be something more directly applicable," (Supp. Record at 208); and "I have some doubt

---

retires. Further, it would be unduly harsh to penalize appellants for their imperfectly timed request in this case because of the importance of the proper placement of the burden of proof, and because the trial judge had an opportunity to correct his error, without prejudice to the appellees, when the jury returned to the courtroom to receive clarifying instructions concerning, among other things, the meaning of implied authority. (Supp.Record at 378–83.) Appellants' counsel renewed his objection to the instructions at that point. (Supp.Record at 383.)

about their admissibility." (Supp.Record at 209.) When appellants requested an instruction to the effect that any violation of the two code sections would be negligence as a matter of law, the court refused it, stating: "I have some doubt . . . as to whether they apply" (Supp.Record at 310); and "having the doubt that I do about it, . . . the Court will instruct the jury . . . that if they find there are any violations of this statute, they may consider them as evidence."

■ The applicable law in this jurisdiction is as follows: " '[W]here a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute, *unexplained* violation of that standard renders the defendant negligent as a matter of law.' " *Ceco Corp. v. Coleman, supra,* 441 A.2d at 945, *quoting Richardson v. Gregory,* 108 U.S. App.D.C. 263, 266, 281 F.2d 626, 629 (1960). The party relying upon the statutory standard must, at the outset, establish its applicability by showing that he is within the class of persons intended to be protected by it, and that the injury incurred resulted from the type of risk against which the statute was designed to protect. *See generally,* W. PROSSER, THE LAW OF TORTS § 36 at 190–200 (4th ed. 1971). "[I]f a party charged with statutory or regulatory negligence produces competent evidence tending to explain or excuse [the] violation . . . the jury is properly instructed . . . that the violation is evidence of negligence, but not negligence as a matter of law." *Ceco Corp. v. Coleman, supra* 441 A.2d at 945.

■ In this case, appellants failed to make a threshold showing to the trial court sufficient to establish that §§ 1304 and 1306 apply to subway construction. When the question of their applicability was raised, appellants claimed that WMATA is bound, under its charter, by the District's building code (rather than · by any other statutory construction standards uniquely applicable to subway construction), yet failed to offer a copy of the charter into evidence. Appellants also did not proffer any evidence regarding the purpose and scope of the two building code sections or the meaning of the key terms in them. Nor did appellants either introduce the Construction Safety Standards referred to in § 1304 or explain why they considered § 1306 a specific standard of conduct to which the rule regarding negligence *per se* should apply, since § 1306 merely requires a structure to be "sufficiently supported."

Moreover, even if appellants *had* made a sufficient showing that §§ 1304 and 1306 apply to the circumstances of this case, and even if the rule of negligence *per se* were therefore applicable, appellants presented insufficient evidence that the two building code sections were, in fact, violated. *See Stevens v. Hall,* 391 A.2d 792, 796 n. 2 (D.C.App.1978). At no time during trial did appellants make a proffer as to precisely what the building code requires and how it was violated, such that appellees would have an opportunity to explain the alleged violation.[15]

Under these circumstances, we conclude that the trial court did not err in declining to instruct the jury that a violation of §§ 1304 or 1306 would constitute negligence *per se.*

---

**15.** Appellants presented an expert witness at trial who testified that appellants' building was not underpinned by pilings or concrete during the construction, and who stated that "something was lacking" in the precautions taken by the contractor to protect appellants' building. (Supp.Record at 164–66.) He stated further that, in his opinion, the contractor was negligent. (Supp.Record at 166.) However, the expert conceded, and it was generally agreed that other satisfactory methods of protection might have been used (Supp.Record at 164, 181, 345); and nowhere in his testimony did the expert witness refer to the requirements of the building code. The paucity of evidence on this issue and on the broader negligence issue is illustrated by the discussion in the record of appellants' request for a. *res ipsa loquitur* instruction (based on the unavailability of information as to the precautions WMATA did or did not take), which was denied. (Supp.Record at 128–50.)

## IV

There being error in the trial court's failure to instruct the jury regarding the burden of proving the agency relationship, however, the judgment on appeal herein is reversed and the case remanded for a new trial.

*So ordered.*