**CHO MARK ORIENTAL FOOD, CHUN O. K. LEE**, and **HYE YON PAK**, Plaintiffs–Appellants, v. **K & K INTERNATIONAL, YOUNG HO KIM, BROTHER'S REALTY**, and **MIN HO YANG**, Defendants–Appellees

NOS. 15183 and 15337

(CIV. NO. 88–0862)

SEPTEMBER 9, 1992

LUM, C.J., WAKATSUKI, MOON, LEVINSON, JJ., AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF KLEIN, J., RECUSED

510

OPINION OF THE COURT BY LEVINSON, J.

The plaintiffs–appellants Cho Mark Oriental Food, Ltd. (Cho Mark), Chun O.K. Lee (Chun Lee), and Hye Yon Pak (Pak) appeal the May 2, 1991 judgment, wherein the trial court found in favor of the defendants–appellees K & K International (K & K), Young Ho Kim (Kim), Brother's Realty (Brother's), and Min Ho Yang (Yang) on all the plaintiffs' claims arising from an alleged breach of a commercial lease. We affirm.

## I.

All parties are members of a small, closely associated Korean immigrant community located near Ala Moana Shopping Center in Honolulu. Yang is a licensed real estate broker and owns and operates Brother's, a real estate firm. He primarily assists Korean immigrants in locating residential and commercial space. Kim owns several corporations, including K & K, which operate four retail outlets specializing in fine jewelry and European clothing. Chun Lee and Pak own and operate Cho Mark Restaurant, a Honolulu eating establishment. Both Kim and Yang, as well as

their family and friends, patronized the Cho Mark Restaurant. Yang's mother and Kim's mother–in–law were friends; Yang's mother and Pak's mother were best friends — "almost like sisters." Pak's sister had bought her apartment through Yang, and Pak had purchased insurance from Yang's younger brothers. Yang, Kim, Pak, and Yang and Pak's mothers were, at one time, members of the Korean Bethel Baptist Church. They all left together to form their own church.

In April 1987, Kim purchased certain real property (the Sheridan Street property) through Yang, including a building (the premises) located at 808 Sheridan Street in Honolulu. Yang received a $40,000 commission from Kim for brokering the purchase of the Sheridan Street property. Kim's intent was to renovate the premises, formerly a printing business, into commercial leasehold space. Upon taking title to the premises, Kim listed K & K as the landlord of the premises, noting himself as the owner. He hired a general contractor (GC) to demolish the interior of the premises, partition new spaces to be leased commercially, and install five electrical panels for conversion of the existing 480 volt electrical service to 220 volt electrical service.

About the time Kim purchased the premises, Chun Lee and Pak decided to open a retail oriental food market. Pak approached Yang following a church service and asked him for assistance in finding space for the proposed food market. Yang showed Pak the premises while it was being gutted by the GC and informed her that, because renovations were not completed, she could get a favorable rental rate of one dollar per square foot. Pak and Chun Lee were interested in the proposition, and on April 24, 1987, Yang presented them with a lease agreement (the lease), unsigned by Kim. Although Chun Lee and Pak signed the lease in April 1987, they retained possession of it until July 1987, at which time they caused their signatures to be notarized. Kim executed the lease shortly thereafter. Chun Lee and Pak signed the lease in their

respective capacities as officers of Cho Mark (hereinafter collectively Cho Mark), and Kim signed as president of K & K. *Yang received no commission or compensation of any kind for his involvement in arranging the lease.*

Although the lease was not formally executed until July 1987, Cho Mark took possession of the leased space (the space) sometime in April 1987 and began conforming the space to Cho Mark's particular needs. E.D. Lee, Chun Lee's husband, was responsible for renovating the space according to Cho Mark's specifications. He hired a journeyman electrician to install the necessary electrical wiring, outlets, and hookups downstream from the electrical panels, which were to be installed by the GC. Due to a misunderstanding among the parties, neither Cho Mark nor Kim secured the electrical permit required by Hawaiian Electric Company (HECO) from the appropriate municipal authority as a precondition to the installation of a separate electric meter for the space. Such a meter was necessary to supply the space with electricity of sufficient amperage to operate the large electrical appliances and machines required to operate a food market. Because Cho Mark never received sufficient electrical power, it never opened its doors and abandoned the space in March 1988.

On October 23, 1989, Cho Mark filed a second amended complaint against Kim, K & K, Yang, and Brother's for damages allegedly incurred as a result of the inadequate electricity supplied to the space. In substance, Cho Mark alleged that: (1) Yang had been acting as Kim and Cho Mark's dual agent in arranging the lease of the space; (2) Kim and Yang "were responsible for providing plaintiffs with a premises that had proper electrical hook ups" [sic] and failed to do so; and (3) "at no time.... did ... [they] inform any of [the] plaintiffs that the power supply ... was inadequate for and not adapted to" Cho Mark's needs. In their answers, Kim, K & K, Yang, and Brother's asserted that Cho Mark was legally responsible for any of its alleged losses because Cho Mark was responsible

under the lease for obtaining the necessary permit for the electrical power it required. Following a bench trial, final judgment was entered in favor of all defendants. Cho Mark timely appealed.

## II.

On appeal, Cho Mark challenges a multiplicity of the trial court's findings of fact (FOFs) and conclusions of law (COLs). Cho Mark contends, *inter alia*, that the trial court erred in determining that: (1) Yang was not Kim and Cho Mark's dual agent for purposes of arranging the lease and managing the renovations of the premises; (2) the lease did not provide that Kim was responsible for arranging the electricity for Cho Mark's intended use of the space; and (3) neither Kim nor Yang made any representations, negligent or otherwise, that they would be responsible for securing the permit necessary for HECO to install an electrical meter for the space. We address these three contentions only. Cho Mark's other points of error are without merit.[1]

---

[1] In Count I of their second amended complaint, Cho Mark also sought to recover damages based on the breach of an implied warranty of habitability and fitness for intended use. While Hawaii was one of the first jurisdictions to extend the theory of implied warranty of habitability and fitness for intended use to residential leases, *see Lemle v. Breeden*, 51 Haw. 426, 433, 462 P.2d 470, 474 (1969), this court has never extended the theory to commercial leases. Few jurisdictions have done so. *See* Greenfield & Margolies, *An Implied Warranty of Fitness for Nonresidential Leases*, 45 ALB. L. REV. 855, 872 (1981). In the few cases that have extended such an implied warranty to a commercial lease, the subject lease has expressly provided that the lessor would furnish the disputed service. *See, e.g., Westrich v. McBride*, 204 N.J. Super. 550, 499 A.2d 546 (1984) (express clause in lease that lessor would provide lessee with heat); *Davidow v. Inwood North Professional Group – Phase I*, 747 S.W.2d 373 (Tex. 1988) (lease expressly required that lessor provide air conditioning, electricity, hot water, janitorial and maintenance services, light fixtures, and security services). In this case, the lease did not expressly provide that the lessor (Kim and K & K) would furnish electricity sufficient for the lessee's (Cho Mark's) intended use. Therefore, while dictum in *Lemle* arguably supports the extension of the theory of implied warranty

## A.

The trial court ruled, in COL Nos. 4 and 5, that Yang was not the agent of either Kim or Cho Mark "in regards to the Lease." Cho Mark urges that these COLs are erroneous because they are based on numerous FOFs that are likewise erroneous. Inasmuch as COL Nos. 4 and 5 derive from the facts and circumstances of the parties' relationship reflected in the trial court's FOFs, we review the challenged COLs under the clearly erroneous standard. *See Coll v. McCarthy*, 72 Haw. 20, 28, 804 P.2d 881, 886 (1991). Pursuant to the clearly erroneous standard of review, the trial court errs when, despite evidence to support the FOFs, the appellate court is left with the definite and firm conviction, upon review of the entire record, that a mistake has been committed. *Id.* at 28, 804 P.2d at 886; *see also Gadd v. Kelley*, 66 Haw. 431, 442–43, 667 P.2d 251, 259 (1983); *Waugh v. University of Hawaii*, 63 Haw. 117, 132, 621 P.2d 957, 969 (1980).

An agency relationship may be created through actual or apparent authority. *See, e.g., Wells Fargo Business Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 944–45 (5th Cir.), *cert denied*, 464 U.S. 818 (1983); Restatement (Second) of Agency §§ 7, 8, 26, 27 (1958). Actual authority exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act[,]" *id.* at § 15, and may be created by express agreement or implied from the conduct of the parties or surrounding circumstances. *See Wong Wong v. Honolulu Skating Rink, Ltd.*, 24 Haw. 181, 192 (1918); *Baron v. Bryant*, 556 F. Supp. 531, 538 (D. Hawaii 1983); *Wells Fargo*, 695 F.2d at 944; Restatement (Second) of Agency §§ 7 comment c, 26 comment c. Express actual authority requires an oral or written

of habitability and fitness for intended use to commercial leases, the circumstances of this case do not present an appropriate vehicle for addressing this issue, and we decline to do so at this time.

agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain acts. *See Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.*, 414 F.2d 750, 755 (9th Cir. 1969) (applying Hawaii law); *Gulf Ins. Co. v. Grisham*, 126 Ariz. 123, 126, 613 P.2d 283, 286 (1980). There is no evidence in the record of an oral or written agreement between Kim and Yang. Implied actual authority "may arise either independent of any express grant of authority . . . or it may arise as a necessary or reasonable implication required to effectuate some other authority expressly conferred by the principal." *Wells Fargo*, 695 F.2d at 944–45. However, the focus is on the agent's understanding of his authority inasmuch as the relevant inquiry is "whether the agent reasonably believes, because of the conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act." *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 670 n.7 (D.C. App. 1983) (citing W. SEAVEY, AGENCY § 18, at 33 (1964)). *Accord* RESTATEMENT (SECOND) OF AGENCY § 7 comments a, b, & c. In the present case, Yang testified that he was not motivated by any communication from Kim, but rather by his own desire to help Pak, his good friend, find business space for the food market. There is no direct evidence in the record that Yang believed he was acting in accordance with Kim's desires.

On the record before us, the only plausible theory supporting an agency relationship between Yang and Kim is that of apparent authority. Apparent authority arises when "the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he was purported to have." *Hawaiian Paradise Park Corp.*, 414 F.2d at 756; *see also Grisham*, 126 Ariz. at 126, 613 P.2d at 286; RESTATEMENT (SECOND) OF AGENCY §§ 8, 27. The critical focus is not on the principal and agent's intention to enter into an agency

relationship, but on whether *a third party* relies on *the principal's* conduct based on a reasonable belief in the existence of such a relationship. *See, e.g., Lewis*, 463 A.2d at 670 n.7. Apparent authority can occur under the following circumstances:

> (1) *[T]he principal has manifested his consent* to the exercise of such authority or *has knowingly permitted* the agent to assume the exercise of such authority; (2) . . . *the third person* knew of [the principal's actions] . . . and, acting in good faith, had reason to believe, and *did actually believe*, that the agent possessed such authority; and (3) . . . the third person, *relying on such appearance of authority*, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

*Knox–Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 40 (Tenn. 1988) (quoting 3 AM. JUR. 2D *Agency* § 80) (1986) (emphasis added).

We are persuaded that the trial court's finding that Yang was not the dual agent of Kim and Cho Mark "in regards to the Lease" turned on the testimony of the witnesses, particularly regarding the question whether Cho Mark actually believed that Yang had apparent authority, as agent, to bind Kim and K & K in connection with the execution of the lease. Due regard must be given to the trial court's opportunity to judge the credibility of witnesses. *See* Hawaii Rules of Civil Procedure (HRCP) 52(a); *see also Waugh*, 63 Haw. at 132, 621 P.2d at 969; *Shinn v. Edwin Yee, Ltd.*, 57 Haw. 215, 219, 553 P.2d 733, 737 (1976) ("It is for the trial court to determine whether and to what extent a witness is worthy of credit, and to give his testimony the weight that it deserves. The court may accept or reject the testimony of a witness in whole or in part."). Furthermore, where the trial court's determinations of fact are largely dependent upon the resolution of conflicting testimony,

great weight will be accorded its FOFs upon review. *Shinn*, 57 Haw. at 219, 553 P.2d at 737.

Cho Mark's claimed damages resulted from reliance on alleged representations made by Yang, during the time the space was being renovated, that sufficient electricity would be supplied to Cho Mark for operation of its food market. Even if Yang made such representations, the record supports the conclusion that they played no part in the execution of the lease, but rather that Cho Mark was motivated by the advantageous rental rate for the space. Moreover, even if the evidence had unequivocally shown that Yang had apparent authority regarding the negotiation and execution of the lease, Cho Mark would have had to prove, in addition, that Yang had authority to manage the renovations to the premises because such authority does not *ipso facto* follow from authority in connection with the execution of the lease. *See Federal Enterprises, Inc. v. Greyhound Leasing & Financial Corp.*, 786 F.2d 817, 820–21 (8th Cir. 1986) ("[A] 'third person dealing with an agent . . . had the duty of ascertaining for himself, the agent's authority[ ]' [and] [s]uch an inquiry includes determining that a supposed agent really is an agent, ascertaining the type of agency, and assuring that the act is within the limits of the agent's authority."); *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir. 1978) ("[E]ven if [the third party] was justified in believing that [the person] was . . . [the defendant's] employee, he was bound to inquire what his authority was . . . ."); *Springfield Television, Inc. v. Gary*, 628 S.W.2d 398, 403 (Mo. App. 1982) ("[A] person dealing with a supposed agent has a duty to ascertain for himself the fact and scope of agency."). The record establishes that at no time before commencing litigation did Cho Mark contact Kim to determine the extent of Yang's authority.

However, Cho Mark contends that the GC's submission of the renovation proposal to Yang is sufficient evidence to support

Yang's apparent authority to manage the renovations. Such evidence would be probative only if Cho Mark had knowledge of the GC's submission when it allegedly relied on Yang's representations regarding the electricity. Cho Mark had the burden of establishing the agency relationship; there is nothing in the record to show that Cho Mark was aware of the GC's conduct during the critical period.

Therefore, we will not disturb the trial court's determination that Yang was not Kim's agent "in regards to the Lease."

## B.

In COL Nos. 10 and 11, the trial court concluded that: (1) the lease imposed responsibility on Cho Mark for all renovations, including the finishing of the space for its intended business; and (2) Cho Mark was responsible for obtaining all necessary permits from the municipal authorities to complete the space. To determine whether the trial court erred in rendering these COLs, we must review the lease. While a lease is both a conveyance and a contract, its essence is contractual; accordingly, we review the lease under principles of contract law. *Maui Land & Pineapple Co. v. Dillingham Corp.*, 67 Haw. 4, 10, 674 P.2d 390, 394 (1984). As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court. *See Stewart v. Brennan*, 7 Haw. App. 136, 142, 748 P.2d 816, 821 (1988) (citing *Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984)).

Section 7(f) of the lease provides in relevant part:

(f) Renovations and Security: *Renovations, if any, shall be made by the Lessee* .... Any renovations undertaken must be done in conformity with appropriate governmental regulations and any required building permits will be posted on the premises during such renovations.

(Emphasis added.) Cho Mark contends that the phrase "if any" indicates that the clause was not meant to apply to the initial completion of the space, but only to renovations that might follow later. On the other hand, Kim and Yang contend that section 7(f), and the use of the term "renovations" therein, is unambiguous and as such applies to all renovations. We agree with Kim and Yang. A contract term or phrase is only ambiguous when it is capable of being reasonably understood in more ways than one. *Stewart*, 7 Haw. App. at 142–43, 748 P.2d at 821. In our view, the only reasonable understanding of the phrase "renovations, if any" within the context of the lease as a whole is *any* renovations to the space that might be effected.

Absent an ambiguity, contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech. *See Maui Land*, 67 Haw. at 10, 674 P.2d at 394. "Renovation" is the noun form of the word "renovate," which means "to restore to good condition; *make new* or as if new again; repair." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 1215 (1989) (emphasis added). Thus, because the lease expressly provided that Cho Mark was responsible for *any* renovations of the space, Cho Mark was responsible for making the space "new" for its intended purpose. Furthermore, section 7(f) of the lease unequivocally provides that "[a]ny renovations undertaken must be done in conformity with appropriate governmental regulations." This requirement necessarily implies that Cho Mark was responsible for securing all required permits, including electrical permits, to renovate the space. Therefore, the trial court's COL Nos. 10 and 11 are not clearly erroneous.

## C.

Cho Mark's remaining contention meriting our attention attacks the trial court's FOF No. 41 and its derivative COL No. 11. FOF No. 41 found that neither Kim nor Yang made representations, either expressly or negligently, that they would be responsi-

ble for obtaining the proper permits from the municipal authorities to enable Cho Mark to renovate the space for its intended use. The record reflects that Kim never communicated with Cho Mark either about the electricity problem or obtaining the necessary permits for Cho Mark. Indeed, the record reveals that Kim made no representations whatsoever to Cho Mark. Because we have concluded that the trial court was not clearly erroneous in its determination that Yang was not the agent of either Kim or Cho Mark, Kim cannot be liable to Cho Mark based on any representations that Yang may have made regarding the electrical permit issue.

Yang testified that he only talked to E.D. Lee, Cho Mark's manager for purposes of renovating the space, about getting the necessary electrical permit; Yang also testified that, upon learning from E.D. Lee that Cho Mark did not have a permit, his statement was, "[y]ou supposed to draw the plan yourself and you have to get your own permit. Why don't you ask your architect to do that." Finally, Yang testified that in none of the subsequent conversations he had with E.D. Lee with regard to obtaining the proper permit did he state that he would be responsible for obtaining it. On the other hand, both Chun Lee and Pak testified that Yang requested $5,200 from them, stating that "they" would need an additional $5,200 to bring in electricity and that this money would be used for an electrical meter. E.D. Lee testified that he had told Yang on several occasions that the necessary electricity was not in yet and that Yang's response was always, "It's going to be done right away." The journeyman electrician hired by Cho Mark testified that E.D. Lee, and maybe Yang, told him that there was "plenty powers, you can tap any power you like" and that Yang, E.D. Lee, and "everybody" had promised that the power supply was the landlord's responsibility.

Apparently relying on the testimony of Chun Lee, Pak, E.D. Lee, and the journeyman electrician, Cho Mark argues that, if only by implication, Yang either fraudulently or negligently repre-

sented that he would be responsible for obtaining the necessary permit. FOF 41 reflects that the trial court found to the contrary, and we conclude that the finding was not clearly erroneous. Accordingly, we conclude that Cho Mark's misrepresentation claims are without merit.

### III.

We agree with the trial court's rulings that Cho Mark was solely responsible for all renovations of the space for its intended purpose, i.e., the initial completion of the space, including the securing of any permits required for such renovations. Because Cho Mark failed to secure the electrical permit, without which HECO would not install an electrical meter for the space, Cho Mark was solely responsible for any losses it incurred due to insufficient amperage of the electricity supplied to the space. [2] Accordingly, we affirm the trial court's judgment in favor of the defendants.

*Jerry A. Ruthruff* for defendants–appellees.

*Gary G. Grimmer* (*Andy M. Ichiki* with him on the briefs; Carlsmith, Ball, Wichman, Murray, Case, Mukai & Ichiki, of counsel) for plaintiffs–appellants.

### CONCURRING OPINION BY BURNS, J.

The circuit court's Conclusions of Law 4 and 5 state as follows:

> 4. At all relevant times herein, Yang and/or Brother's were never agents for Kim and/or K & K in regards to the Lease.

---

[2] Even if Kim had timely obtained proper permits for the premises, it was still necessary for Cho Mark to obtain the electrical permit for its space. The trial court found, in FOF Nos. 46, 52, and 54, that Cho Mark presented no evidence that it had prepared any electrical drawings or plans whatsoever, which were a prerequisite

5. At all relevant times herein, Yang and/or Brother's were never agents for Lee and/or Pak in regards to the Lease.

The majority opinion concludes that "[i]nasmuch as COL Nos. 4 and 5 derive from the facts and circumstances of the parties' relationship[,] reflected in the trial court's FOFs, we review the challenged COLs under the clearly erroneous standard." Majority Opinion, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992) (citation omitted). I disagree with this conclusion.

It has been observed that:

When a [Hawaii] trial judge addresses a mixed [fact and law] question, any one of three standards of review may apply: no substantial evidence, clearly erroneous, or free review. Which standard applies to a given decision is a function of historical precedent and policy.

* * *

. . . Hawaii appellate courts have applied the clearly erroneous standard when reviewing judicial findings on mixed but factually–oriented issues. . . .

* * *

. . . Hawaii courts have held that certain mixed law and fact decisions are freely reviewable if the legal portion of the fact/law mix is erroneous, or if the factual finding is induced by an error of law. . . .

Yoshii, *Appellate Standards of Review in Hawaii*, 7 U. HAW. L. REV. 273, 288–90 (1985) (footnotes omitted).

---

to obtaining a building permit and which included the electrical permit. Our review of the record confirms these findings. Therefore, because Cho Mark could not show that it undertook to obtain the electrical permit, any alleged delinquency on Kim's part in failing to obtain proper permits would not be a legal cause of Cho Mark's claimed damages.

Attorney Yoshii has accurately summarized Hawaii's precedent. He has also accurately noted that "Hawaii appellate courts ... have never carefully analyzed their standards of review." *Id.* at 285 (footnote omitted). In other words, Hawaii's precedent on this subject is gobbledygook designed and calculated to avoid the task of distinguishing findings of fact from conclusions of law while validating a desired result. In my view, with respect to appellate standards of review, there are no questions of mixed fact and law. Conclusions of Law 4 and 5 are good examples.

The question of what is an "agency" is a question of law.

> Agency is a consensual relationship. The relationship is created only when one person manifests an intention that another shall act in his behalf and the other person consents to represent him. The relationship is most often thought of as being contractual though it is not necessary that the relationship arise out of contract. Since the relationship is not necessarily contractual, consideration is not required for the creation of an agency and the capacity to contract on the part of both parties is not necessary.

H. REUSCHLEIN AND W. GREGORY, THE LAW OF AGENCY AND PART-NERSHIP § 12 (2d ed. 1990).

As with all questions of law, the standard of appellate review applicable to the question whether the lower court correctly defined "agency" is the de novo or right/wrong standard.

The question of what are the facts in a particular case is a question of fact. As with all questions of fact in nonjury cases, the applicable standard of appellate review is the clearly erroneous standard.

The question of whether the relevant facts in a particular case constitute "agency" as defined by the law is a question of law reviewed pursuant to the de novo or right/wrong standard of appellate review. It is a question of law because in any given factual

situation there can be only one right answer. If it was categorized as a question of fact or mixed fact and law reviewable pursuant to the clearly erroneous standard of appellate review, then in any given factual situation two or more contradictory right answers would be permitted.

In all other respects, I concur with the majority opinion.