**SIGAL CONSTRUCTION CORPORA-
TION, Appellant/Cross–Appellee,**

v.

**Kenneth S. STANBURY,
Appellee/Cross–Appellant.**

Nos. 89–866, 89–960.

District of Columbia Court of Appeals.

Argued Oct. 23, 1990.
Decided Feb. 5, 1991.

William J. Carter, Washington, D.C., for appellant/cross-appellee, Sigal Const. Corp.

Bruce M. Bender, Rockville, Md., for appellee/cross-appellant, Kenneth S. Stanbury.

Before FERREN, BELSON, and FARRELL, Associate Judges.

FERREN, Associate Judge:

In this defamation case, a jury awarded appellee, Kenneth S. Stanbury, $370,440 against his former employer, appellant Sigal Construction Corporation. The jury found that a Sigal project manager, Paul Littman, had slandered Stanbury while giving an employment reference to another construction company after Sigal had ter-

minated Stanbury's employment. The trial court denied Sigal's motion for judgment notwithstanding the verdict or for a new trial. The court, however, granted a remittitur ordering Stanbury to accept $250,000 or a new trial for damages. Stanbury accepted the $250,000. Sigal appeals the trial court's denial of its motion for judgment notwithstanding the verdict, claiming: (1) Littman's statements were constitutionally protected opinions, not actionable statements of fact; (2) the statements, even if factual, were protected by a qualified privilege which had not been overcome by clear and convincing evidence showing common law malice; (3) Sigal, in any event, could not be held liable for Littman's statements because he had not made them within the scope of his employment, either as a matter of actual authority—express or implied—or as a matter of apparent authority; (4) the court erroneously gave jury instructions on implied and apparent authority; erroneously gave other instructions that allowed the jury improperly to find Stanbury had overcome Sigal's qualified privilege by a showing of mere negligence; and erroneously refused to give an instruction on "corporate malice" that would have permitted the jury to find Sigal liable only upon a showing that Sigal had authorized or ratified Littman's conduct; and (5) the evidence, in any event, was insufficient to sustain the award of damages in the remitted amount of $250,000. Stanbury cross-appeals, contending the trial court abused its discretion in ordering the remittitur. We affirm.

## I. Facts and Proceedings

Stanbury worked as a project manager for Sigal from May 1984 to June 1985. According to Sigal's personnel manager, Pamela Heiber, Sigal terminated Stanbury's employment because he "was not doing his job correctly." Sigal, however, told Stanbury he was let go for "lack of work or reduction in work." According to Heiber, "[w]e felt sympathy for Ken because of his age in life" (he was 63 when Sigal terminated his employment). Stanbury contacted Ray Stevens, a previous

employer and Regional Manager at Daniel Construction, to find out whether any work was available. Some time later, Stevens called Stanbury about employment as a project manager on the Pentagon City project. Stanbury was eventually offered the job subject to approval by the owner of the project, Lincoln Properties.

William Janes, a Lincoln Properties general partner, had responsibility for investigating Stanbury's employment references. Janes called David Orr, a former Sigal project executive, who suggested that Janes contact Paul Littman, a current Sigal project executive. Janes did so, and Littman later memorialized the conversation:

> [Janes] claimed David [Orr] had told him not to hire Ken [Stanbury] and asked me what I thought. I told him.
>
> 1) Ken seemed detail oriented to the point of losing sight of the big picture.
>
> 2) He had a lot of knowledge and experience on big jobs.
>
> 3) With a large staff might be a very competent P.M. [project manager].
>
> 4) Obviously he no longer worked for us and that might say enough.
>
> These paraphrase what I said nearly word for word.

At trial, Littman acknowledged and Stanbury confirmed that Littman had made these statements without having supervised, evaluated, read an evaluation of, or even worked with Stanbury (other than seeing Stanbury in the halls at the office). According to them both, their contact was entirely casual. More specifically, Stanbury testified without contradiction that he had talked to Littman only once during Stanbury's fourteen months with Sigal, and that this conversation was a general discussion about Stanbury's previous job. According to Littman, in evaluating Stanbury for Janes he relied entirely on the "general impression [he] had developed" from "hearing people talk about [Stanbury's] work at the job", perhaps at "casual luncheons" or "project executive meetings" or "over a beer on a Friday afternoon."[1] Littman did

---

**1.** [Counsel]: And with respect to watching [Stanbury] work, that was over—just by walk-

nothing to verify the second-hand knowledge he had acquired about Stanbury. At trial, he could recall no facts or work-related incidents that would support the impressions he reported to Janes. When asked where his information about one of Stanbury's projects came from, Littman testified that "[t]here aren't any real specific instances I can point to. I think it was a general opinion I had just developed in the year or two [Stanbury] had been there." Littman thought that his opinion "possibly" came from "hearing people talk about [Stanbury's] work or job."

In contrast with Littman's acknowledgments at trial that his information about Stanbury was limited to vague hearsay, Janes testified at trial that Littman appeared to have knowledge of Stanbury's performance—indeed, that Littman told Janes he had worked with Stanbury on a project. Janes further testified that he could not recall whether Littman had acknowledged never supervising or seeing an evaluation of Stanbury. Littman's trial testimony substantially corroborated Janes' account of his interaction with Littman. Littman testified that Janes knew Littman was a project executive (who would supervise a project manager), that Stanbury was a project manager, and that Littman did not tell Janes he had never supervised, worked with, evaluated, or read an evaluation of Stanbury even though Littman knew Janes wanted to speak with someone who had "interact[ed]" with Stanbury. Littman also testified that, although he lacked explicit authority from Sigal to provide employment references, it was com-

mon in the construction industry for someone in his position to do so.

Although the impact of Littman's statements on Janes was disputed at trial,[2] Daniel Construction did not hire Stanbury for the Pentagon City project or for any other project. According to Stanbury, Stevens told him that Daniel Construction had not hired him because Lincoln Properties would not approve him. Stanbury further testified that, according to Stevens, Lincoln Properties (presumably Janes) had made "serious negative comments" about Stanbury and that Daniel Construction would have hired him but for Lincoln Properties' disapproval. Stanbury concluded, after further contacts, that Daniel Construction would not consider him for other projects because of Lincoln Properties' negative impression attributable to Littman's comments.

Stanbury did not find employment until April 1986, when Mergentine–Perini Corporation hired him at an annual salary of $27,000 (he had received unemployment compensation from June 1985 to April 1986). In July 1987, Stanbury resigned from Mergentine because his wife no longer could work and they no longer could afford to live in this area on his salary. They moved back to Pennsylvania. In September 1988, Stanbury began working at Holicong Hardware as an independent contractor at $6.00 per hour.

Stanbury filed this lawsuit in December 1986 claiming (1) defamation, (2) tortious interference with business relations, (3) negligence, and (4) breach of contract. Specifically, he claimed damages for loss of employment, wages, and benefits totalling

---

ing down the hall and seeing [Stanbury] working away?
[Littman]: Yes, pretty much.
[Counsel]: And what percentage of your time as a project executive would you say you spent watching [Stanbury] work?
[Littman]: I don't know. I would imagine a very small percent.
[Counsel]: And with respect to hearing people talk about [Stanbury], where would these discussions take place?
[Littman]: They might take place at casual luncheons. I did attend project executive meetings where we talked about any issues germane to any of the projects that were on-

going. It may have been over a beer on a Friday afternoon.
[Counsel]: So you're not sure at which of these sessions, lunch, or project executive meetings or having a beer, where you picked up your information about Mr. Stanbury?
[Littman]: Not specifically, no.

2. Janes testified that although he did draw certain factual inferences from Littman's statements and that they "gave me concern perhaps a little bit . . .," he did not recommend Stanbury to Lincoln Properties because he wanted someone from within Daniel Construction who would require a shorter start-up period.

$250,000 and damage to his professional reputation and standing, as well as humiliation and mental anguish, totalling $500,000. In his pretrial statement, Stanbury specified $210,000 as damages for lost wages. Sigal moved for summary judgment, which the trial court denied. After trial began, the court allowed Stanbury to amend the complaint to request compensatory damages for loss of reputation, embarrassment, and humiliation totalling $500,000. After presentation of Stanbury's evidence, the trial court granted Sigal's motion for directed verdict on the counts alleging negligence and breach of contract, and specifically ruled that the negligence count was subsumed under the defamation count. At the close of all the evidence Sigal moved, once again, for a directed verdict, which the court denied.

Over objection, the trial court instructed the jury on negligence, as well as on implied and apparent authority, and refused to instruct the jury on "corporate malice." The jury returned a plaintiff's verdict for $370,440.

Sigal moved for judgment notwithstanding verdict and, in the alternative, for a new trial or a remittitur. The trial court denied a judgment n.o.v. and a new trial but ordered Stanbury to accept a remittitur of $120,440 for damage to his career (leaving a total award of $250,000) or a new damage trial. Stanbury accepted the reduced award. Sigal filed a timely notice of appeal, and Stanbury cross-appealed as to the remittitur.

## II. APPLICABLE LAW

The parties agree that Virginia law governs this case. The trial court apparently accepted this proposition, but the record does not make clear why Virginia law should apply. Furthermore, although Virginia law resolved the summary judgment motion, the parties and the court did not look to Virginia in all instances. For example, no one objected to the trial court's use of the District of Columbia's standard jury instruction for scope of employment, even though Virginia caselaw indicated a somewhat different—although similar—formulation. *Compare Johnson v. Weinberg*, 434 A.2d 404, 408 (D.C.1981), *with United Bd. of Carpenters & Joiners of Am. v. Humphreys*, 203 Va. 781, 787, 127 S.E.2d 98, 102 (1962), *cert. denied*, 371 U.S. 954, 83 S.Ct. 509, 9 L.Ed.2d 501 (1963). In fact, aside from the trial court's failure to give a "corporate malice" instruction, the choice of law was not in issue at trial. With this one exception, the parties do not fault the trial court's choice of law for instructional purposes, and thus, overall, they apparently agreed on the law which the trial court applied (perhaps because there are few discernible differences between Virginia and District of Columbia defamation law). On the other hand, it is important to note that on the significant issue of defining and applying the "qualified privilege" which a defendant can lose upon a showing of "common law malice"—as discussed later in Part IV—the trial court, and this court on appeal, employ the Virginia definitions set forth in the court's elaborate jury instruction. *See infra* note 18. In sum, we look to Virginia law for resolution of this case where the parties and the trial court have done so, but otherwise we feel free to rely on this court's previous decisions, in addition to Virginia caselaw, where we perceive no material differences in treating common law issues in the respective jurisdictions.

## III. OPINION OR FACT?

■ Sigal first challenges the trial court's refusal to grant a judgment n.o.v. on the ground that the court erroneously characterized Littman's statements as purported facts, not opinions.[3] This argument is attributable to *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), where the Supreme Court stated in dictum:

---

3. The court may grant a judgment n.o.v. only when, viewing the evidence in the light most favorable to the nonmoving party (here Stanbury), no juror could reasonably have reached a verdict for that party. *See McKnight v. Wire Properties, Inc.*, 288 A.2d 405, 406 (D.C.1972); *District of Columbia v. Jones*, 265 A.2d 594, 595 (D.C.1970).

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339–40, 94 S.Ct. at 3006–07 (footnote omitted). Thereafter, a majority of the federal circuit courts of appeal have interpreted the *Gertz* dictum to mean that statements of fact can be actionable defamation; statements of opinion cannot. *See Potomac Valve & Fitting Inc. v. Crawford Fitting Co.,* 829 F.2d 1280, 1286 (4th Cir. 1987) ("The constitutional distinction between fact and opinion is now firmly established in the case law of the circuits"); *Ollman v. Evans,* 242 U.S. App.D.C. 301, 305–06 n. 6, 750 F.2d 970, 974–75 n. 6 (1984) (listing federal circuit court decisions adopting the fact/opinion dichotomy). This court has joined the trend. *See Myers v. Plan Takoma, Inc.,* 472 A.2d 44, 47 (D.C. 1983) (per curiam).

Recently, however, in *Milkovich v. Lorain Journal Co.,* —— U.S. ——, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court ruled that freedom of expression "is adequately secured by existing constitutional doctrine without creation of an artificial dichotomy between 'opinion' and fact." *Id.* 110 S.Ct. at 2706. The Court said, in

effect, that the lower courts had misinterpreted the *Gertz* dictum:

Read in context, ... the fair meaning of the passage is to equate the word "opinion" in the second sentence with the word "idea" in the first sentence. Under this view, the language was merely a reiteration of Justice Holmes' classic "marketplace of ideas" concept. (Citation omitted.)

Thus we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled "opinion." (Citation omitted.) Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that *expressions of "opinion" may often imply an assertion of objective fact.*

*Id.* 110 S.Ct. at 2705 (emphasis added; citation omitted).

■ Accordingly, while reserving a place for non-actionable "figurative or hyperbolic language" that could not reasonably be understood as a defamatory statement, *id.* at 2707; *see id.* at 2706, the Court concluded that the perceived distinction between "opinion" and "fact" was an "artificial dichotomy," *id.* at 2706, which did not advance constitutional analysis. Rather, according to *Milkovich,* any statement—even one expressed as an "opinion"—can amount to actionable defamation,[4] unprotected by the First Amendment, if it reasonably implies a false assertion of fact[5]

**4.** We have noted that a "statement is 'defamatory' if it tends to injure the plaintiff in his [or her] trade, profession or community standing, or lower [the plaintiff] in the estimation of the community." *Moss v. Stockard,* 580 A.2d 1011, 1023 (D.C.1990) (citations omitted).

**5.** Stanbury has proceeded, and the trial court instructed the jury, on the assumption that, as a private figure plaintiff, Stanbury had the burden of proving Littman was negligent, including the fact that his statements were false, even though Sigal is a nonmedia defendant and this case does not involve a matter of public concern. Because Stanbury accepted this burden and prevailed, we have no reason to resolve whether, in any respect, his burden may have been less as a matter of law. A few words of explanation, however, are appropriate. Contrary to the common law presumption that a defamatory statement is false and that the defendant accordingly has the burden of proving the statement is true,

*see Milkovich,* 110 S.Ct. at 2704, the Supreme Court has held that the First Amendment requires a plaintiff to carry the burden of proving the statement is false—at least if the statement is made by a media defendant involving a matter of public concern. *See id.* The Court has not decided whether a private figure plaintiff must prove a defamatory statement by a nonmedia defendant is false. *See id.* at 2706 & n. 6; *id.* at 2708 n. 2 (Brennan, J., dissenting); *see also Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 779 n. 4, 106 S.Ct. 1558, 1565 n. 4, 89 L.Ed.2d 783 (1986); *Hutchinson v. Proxmire,* 443 U.S. 111, 133 n. 16, 99 S.Ct. 2675, 2687 n. 16, 61 L.Ed.2d 411 (1979); *Moss,* 580 A.2d at 1022 & n. 22. This court has indicated in dicta, however, that under the law of this jurisdiction a private figure plaintiff has the burden of proving the falsity of a defamatory statement made by a nonmedia, as well as a media, defendant. *Id.* at 1022 & n. 23. It would appear that the

and the statement is made with the level of fault required for recovery, respectively, by public figures [6] or officials [7] or by private figures.[8]

This case, however, was tried, and appellate briefs were filed, on the premise that the opinion/fact dichotomy derived from *Gertz* and ensuing cases was the applicable law. Thus, the Supreme Court's later decision in *Milkovich*—apparently making some "opinions" actionable that previously would not have been—presents the difficult question whether *Milkovich* applies to this case or, instead, represents a clear enough break with the past to justify only prospective application. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971). Because we conclude (as elaborated below) that Littman's statements about Stanbury were sufficiently factual under the pre-*Milkovich* standard to preclude constitutional protection as "opinion," we need not decide whether *Milkovich* applies. We therefore turn to the *Gertz* caselaw.

Whether Littman made statements of "fact" or of "opinion" is a question of law for the court. *See Myers,* 472 A.2d at 47 n. 2 (citations omitted). In *Myers,* we elaborated a four-part test to help the court determine whether a statement is a constitutionally protected opinion or an actionable assertion of fact. The court must: (1) "examine the allegedly defamatory words in the context of the entire document in which they appear"; (2) determine whether the statements "could be said to imply undisclosed defamatory facts"; (3) "consider whether the allegedly defamatory words are susceptible to proof of their truth or falsity"; and (4) "consider the context in which the document containing the allegedly defamatory reference is published." *Id.* at 47.

 Importantly, application of these criteria must be guided by two principles. First, the allegedly defamatory statements must be viewed in their totality, not as isolated phrases or words. *Id.; Smith v. McMullen,* 589 F.Supp. 642, 645 (S.D.Tex. 1984); *see Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 (9th Cir.1980); *Froess v. Bulman,* 610 F.Supp. 332, 340 (D.R.I.1984). Thus, while certain words or phrases may not, in themselves, imply facts, the statement will be actionable if, taken as a whole, it is objectively verifiable. *See Smith,* 589 F.Supp. at 645.

 Second, allowance must be made for " 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich,* 110 S.Ct. at 2706 (citation omitted). Although a statement may, on first impression, seem factual, often words are used not to implicate underlying acts but "merely in a 'loose, figurative sense' to demonstrate [defendant's] strong disagreement with some of plaintiff's dispositions." *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 381–82, 366 N.E.2d 1299, 1307, 397 N.Y.S.2d 943, 951, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977); *see Letter Carriers v. Austin,* 418 U.S. 264, 284, 286, 94 S.Ct. 2770, 2781, 2782, 41 L.Ed.2d 745 (1974) ("scab", in context of union newsletter, was used "in a

---

only context in which it presently makes a difference whether a defamatory statement is a matter of public importance or concern is when punitive damages are at issue. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 763, 773, 781–84, 105 S.Ct. 2939, 2947, 2952, 2956–57, 86 L.Ed.2d 593 (1985) (plurality and concurring opinions) (*Gertz* punitive damages limitation to libel cases where plaintiff shows "actual malice" does not apply when "defamatory statements do not involve matter of public concern.")

6. *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (actual malice).

7. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (actual malice).

8. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 343, 346–47, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974) (state may define liability standard for media defendant's defamation of private individual); *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 87 (D.C.1980) (adopting negligence standard for media defamation of private individual), *cert. denied,* 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981).

loose, figurative sense ... merely [as] rhetorical hyperbole"); *Greenbelt Coop. Publishing Ass'n v. Bresler*, 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970) ("blackmail," in context, was hyperbole and not actionable). If, for example, an average reader would likely understand that particular words, in the context of an entire article, were not meant to imply factual data but, rather, were intended merely to disagree strongly with the views of the person against whom the words were directed, those words would be protected despite their factual content. *See Letter Carriers*, 418 U.S. at 285, 94 S.Ct. at 2781 (quoting *Greenbelt*, 398 U.S. at 14, 90 S.Ct. at 1542).

█ Applying these principles to this case, we conclude that—viewed (as they must be) in the light most favorable to Stanbury—Littman's statements were expressions of fact, not of constitutionally protected opinion. We look, first, at context.[9] Littman told Janes that Stanbury was "detail oriented ... to the point of losing sight of the big picture."[10] The context of this statement was an interview intended to help Janes (and thus Lincoln Properties) determine Stanbury's suitability for employment.[11] In commenting on Stanbury's work habits, Littman must have known, or at least should have known, that Janes would interpret his statements as factual evaluations of Stanbury's approach to managing a construction project; otherwise, the information would have been meaningless in the context that had generated Janes' inquiry.

Furthermore, in considering the entire context of the statements—an employment reference—we note that, in the very conversation in which Littman made the allegedly defamatory remarks, he made several undisputed factual statements to Janes about Stanbury's history as a project manager, as well as a remark that "he no longer worked for us and that might say enough."[12] These remarks add still additional evidence to support the conclusion that Littman stated actionable facts, not protected opinion. Finally, the fact that Stanbury was not hired, apparently because of Littman's statements, could reasonably be taken as evidence of a factual content to the statements.

As to the second *Myers* criterion, Littman's statements can be said to have implied "undisclosed defamatory facts." Stanbury testified, without contradiction, that "not seeing the big picture" meant in the construction trade that he did not perform his job properly, could not recognize unusual problems, and thus could not determine what is necessary to correct such problems so that the project would be properly completed on time. Stanbury also testified that "seeing the big picture" was critical to the job of project manager:

> It is important because unless you can visualize the whole project and determine whether it is normal or if it is unusual, and if it is unusual how it is unusual, what has to be done to fix it, it can serious[ly] affect your final completion and your cost ... the project manager is the planner and the person that is responsible for the job, and he is the one that has to visualize and make the decisions.

---

**9.** In this slander case, the first and fourth *Myers* criteria focusing on "context" merge. The Littman–Janes conversation, by analogy to the libel action considered in *Myers*, provided both the "context of the entire document" and the "context in which the document containing the allegedly defamatory reference is published." *Myers*, 472 A.2d at 47.

**10.** The trial court ruled that "detail oriented," standing alone, was too vague to constitute a defamatory statement of fact but that it became defamatory when combined with Littman's statement about the "big picture."

**11.** Littman testified that Janes called him because Stanbury "was being considered as a project manager for a project that Lincoln Properties was the developer on."

**12.** In addition to his editorial comment about Stanbury's termination of employment, Littman testified he told Janes that Stanbury had a lot of experience on big jobs and that with a large staff Stanbury might be competent. The trial court ruled that these three "statements in the surrounding context would signal to the average reader that the statements uttered by Littman were assertions of fact."

Moreover, Littman's own testimony buttressed Stanbury's interpretation. Littman said he meant "as an outside observer that the project wasn't going well, and that in the end that was the big picture." Thus, a reasonable juror could find that Littman's statements to Janes implied undisclosed factual data.

The third *Myers* criterion is the verifiability of the statements. Both parties introduced evidence to support either the truth or the falsity of Littman's statements. This evidence made clear that whether Stanbury was too detail oriented to complete the project properly and on time could be objectively evaluated and thus verified.[13] Sigal has proffered no alternative meaning for Littman's statement, either in the trial court or on appeal, that would suggest the words were subjective or vague. We agree with the trial court:

> While [Sigal] asserts that the meaning of the statement may vary from individual to individual, there was no evidence produced by [Sigal] which suggested that the statement made in the context in which it was made, meant anything different than what Plaintiff sought to prove it meant.

Memorandum Opinion and Order, D.C.Super.Ct., June 12, 1989 at 5. In fact, Janes—the person to whom the statement was made, and who was in the best position to interpret what it meant—testified that he derived from Littman's comments specific information concerning Stanbury's work.

Sigal, however, tries to persuade us that *Cole v. Westinghouse Broadcasting Co.*, 386 Mass. 303, 435 N.E.2d 1021, *cert. denied*, 459 U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 603 (1982), supports its position that Littman stated protected opinion. In *Cole*, an investigative reporter was fired for what his ex-employer later called "sloppy and irresponsible reporting"; he claimed

damage to reputation from this and related comments. The court ruled that the statements were protected opinions. Critical to the court's conclusion, however, were the context of the comments and the public nature of the controversy:

> Cole was a public figure at the time of this incident, and that the circumstances surrounding his dismissal were a matter of public interest.... The audience which received the statements, first the reporters and later those reading the newspaper articles, were aware that Cole and [his previous employer] claimed different reasons for Cole's contested dismissal. The newspaper articles included this information. Both reporters acknowledged that [the defendant employer] had made the statements at issue only in response to their further questioning and after qualifying [the employer representative's] remarks as "unofficial." The reporters testified that they understood that her statements were not part of the television station's official release. These factors lend support to our view that the statements were matters of opinion rather than fact.

*Id.* at 311, 435 N.E.2d at 1025–26. No such factors are present in this case. Stanbury is not a public figure; his affairs are not a matter of public interest; there was no apparent dispute about the reasons for his dismissal; Janes was not made aware that Stanbury would contest Littman's statements; and Littman's statements were never qualified as unofficial or unauthorized. Because *Cole* derived these distinctions from an altogether different context, it cannot guide us here.

Sigal also relies on *Rinaldi*. In that case, a judge sued an author and the publisher over allegedly defamatory remarks in an article about the ten worst judges in New York. The court concluded that some of the comments were protected opinion: [14]

---

**13.** Stanbury testified about his general competence in individual tasks on the project. Sigal presented testimony concerning Stanbury's substandard performance on the project, including a memorandum that Mr. Bellingham, Stanbury's supervisor, gave to him criticizing his being too detail oriented.

**14.** The court also ruled that calling the judge "probably corrupt" was akin to accusing the judge of committing a crime and, therefore, was not protected opinion. *Rinaldi*, 42 N.Y.2d at 382–83, 366 N.E.2d at 1307, 397 N.Y.S.2d at 951.

To state that a Judge is incompetent is to express an opinion regarding the Judge's performance in office. Likewise, to advocate a Judge's removal from office is to express the opinion that the Judge is unfit for his office. Both opinions, even if falsely and insincerely held, are constitutionally protected, if the facts supporting the opinions are set forth. Here, [defendant author] set forth the basis for his belief that plaintiff is incompetent and should be removed. Based upon the facts stated and public debate provoked by the statements, each reader may draw his [or her] own conclusion as to whether [the author's] views should be supported or challenged. In short, the matter is subject to public debate.[15]

42 N.Y.2d at 381, 366 N.E.2d at 1306, 397 N.Y.S.2d at 950–51. No such circumstances are present in this case. Littman's comments did not enhance public debate. Moreover, Stanbury had no timely, effective opportunity to respond because the comments were made to Janes without Stanbury's knowledge. In short, unlike *Rinaldi*, the present case reveals no basis on which Janes could objectively evaluate Littman's reported conclusions.

Given the context in which Littman aired his comments about Stanbury, and judged in their entirety, we conclude the statements were assertions of fact within the meaning of *Gertz* and *Myers*, not constitutionally protected opinions.

## IV. Qualified Privilege and Common Law Malice

 Although Littman's statements were actionable assertions of "fact," not constitutionally protected "opinion," Stanbury had the burden of proving Sigal (through Littman) was negligent, including the fact that Littman's statements were false. See *supra* note 5. The trial court accordingly gave the jury a negligence instruction.[16] Sigal does not contest, on appeal, either that the statements were false or were negligently made. Sigal does contend, however—and Stanbury does not dispute—that Littman's negligent statements were subject to a "qualified privilege."[17] *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 152, 334 S.E.2d 846, 853 (1985); *see Brown v. Collins*, 131 U.S. App.D.C. 68, 72, 402 F.2d 209, 213 (1968). According to the Virginia Supreme Court:

> A communication, made in good faith, on a subject matter in which the person communicating has an interest, or owes a duty, legal, moral, or social, is qualifiedly privileged if made to a person having a corresponding interest or duty.

**15.** Additionally, the court in *Rinaldi* relied on the fact that the plaintiff was a judge and that judges should not be oversensitive to the press. 42 N.Y.2d at 381, 366 N.E.2d at 1306, 397 N.Y.S.2d at 950.

**16.** According to the court's instruction, "Slander ... is the negligent publication of a false and defamatory statement about another. Negligent publication is the unreasonable failure under the circumstances to take care that the statement made was true." Standardized Civil Jury Instructions for the District of Columbia, No. 17–2 (1985).

Sigal argues that because the trial court gave a negligence instruction to which it objected, the jury may have overlooked or misinterpreted the instructions about qualified privilege and, as a result, may have concluded that Stanbury could overcome Sigal's privilege merely by showing that Sigal, through its agents, had been negligent. We disagree. When instructing the jury on qualified privilege, the trial court stated, without objection, that Stanbury had to prove common law malice—as comprehensively defined, see *infra* note 18—by clear and convincing evidence. Juries are presumed to follow the trial court's instructions. *Coates v. United States*, 558 A.2d 1148, 1150 (D.C.1989). Thus, even if the jury followed the initial negligence instruction on the falsity issue, the jury—in returning a verdict for Stanbury—still had to find Sigal's qualified privilege had been overcome by clear and convincing evidence, see *infra* note 19, of common law malice. We conclude that the relationship between the two instructions was sufficiently clear and that the negligence instruction did not improperly influence the verdict.

**17.** "Where the facts surrounding publication are undisputed, whether a statement is privileged is a question of law for the court." *Moss*, 580 A.2d at 1024; *see Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C.1983); *Fisher v. Washington Post Co.*, 212 A.2d 335, 338 (D.C.1965); *Haycox v. Dunn*, 200 Va. 212, 222, 104 S.E.2d 800, 811 (1958). We agree that Sigal, although negligent, was entitled to the protection of a qualified privilege unless the privilege was abused.

*Great Coastal,* 230 Va. at 153, 334 S.E.2d at 853 (quoting *Taylor v. Grace,* 166 Va. 138, 144, 184 S.E. 211, 213 (1936)); *see Moss v. Stockard,* 580 A.2d 1011, 1024 (D.C. 1990); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 290 (D.C.1977) (quoting RESTATEMENT OF TORTS § 596). Recently, we have characterized this particular kind of privilege as a "qualified 'common interest' privilege." *Moss,* 580 A.2d at 1023–24.

■ Once the privilege applies, the plaintiff has the burden of proving the defendant has abused, and thus lost, it. *Chatelain,* 374 A.2d at 290; *Gazette, Inc. v. Harris,* 229 Va. 1, 14, 325 S.E.2d 713, 727, *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). To defeat the privilege, a plaintiff must prove the defendant acted with "common law malice." *See Moss,* 580 A.2d at 1024; *Great Coastal,* 230 Va. at 149, 334 S.E.2d at 851 n. 3, 853–54. Such malice implies a greater level of ill will than the mind-set reflected by mere negligence. In this jurisdiction, we have equated common law malice with "bad faith." *See Moss,* 580 A.2d at 1024; *Chatelain,* 374 A.2d at 290. In Virginia

the common law malice formulation, which the trial court used for its instruction, includes "bad faith" but is more comprehensive.[18] The trial court instructed the jury, moreover, that a "privilege is abused" when the plaintiff proves common law malice "by clear and convincing evidence."[19] Importantly, we review the evidence in the light most favorable to the plaintiff. See *supra* note 3. Only if there is no evidence to support a finding of common law malice will a court be justified in withholding the issue from the jury. *Richmond Television Corp. v. United States,* 354 F.2d 410, 414 (4th Cir.1965); *see May Dep't Stores Co. v. Devercelli,* 314 A.2d 767, 774 (D.C.1973).

■ There was sufficient evidence at trial, viewed in the light most favorable to Stanbury, from which a reasonable jury could find by clear and convincing evidence that Littman and Sigal had abused the qualified privilege under Virginia law by acting with "such gross indifference or recklessness as to amount to wanton and willful disregard of the rights of" Stanbury. *Great Coastal,* 230 Va. at 151, 334

---

18. In *Great Coastal,* the Virginia Supreme Court characterized common law malice as "a different and broader concept" than "actual malice." 230 Va. at 149 n. 3, 334 S.E.2d at 851 n. 3. According to that court, "[c]ommon-law malice is defined as 'some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or what, as a matter of law, is equivalent to malice, that the communication was made with such gross indifference and recklessness as to amount to a wanton or wilful disregard of the rights of the plaintiff.'" *Id.* (quoting *Preston v. Land,* 220 Va. 118, 120–21, 255 S.E.2d 509, 511 (1979)). The Virginia court, therefore, approved the following instruction, which the trial court gave in this case:

The qualified privilege may be overcome by showing the defendant acted—
 1. With actual malice.... or
 2. ... he [or she] used language which was intemperate or disproportionate in strength and violence to the occasion and which was unnecessarily defamatory to the plaintiff; or
 3. Not in good faith, and without an honest belief in their truth; or
 4. Deliberately adopted a method of speaking the alleged words which gave unnecessary publicity to such words; or
 5. ... purposely arranged to speak the alleged words in the presence of a person or

persons who were wholly uninterested in the matter and who had no right to be present and who in the natural course of things would not have been present; or
 6. For the purpose of gratifying some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or
 7. With such gross indifference or recklessness as to amount to a wanton and wilful disregard of the rights of plaintiff....
*Great Coastal,* 230 Va. at 150, 334 S.E.2d at 853–54. The Virginia Supreme Court acknowledged that this instruction includes the elements of *New York Times* malice (also called "actual malice"), as well as common law malice. *Great Coastal,* 230 Va. at 151, 334 S.E.2d at 854. Because all elements are stated in the disjunctive, however, the jury did not necessarily have to find the defendant acted with actual malice. *See generally Moss,* 580 A.2d at 1026 n. 29 (distinguishing "common law malice" from "actual malice").

19. The "clear and convincing" standard is required for a showing of *New York Times* (actual) malice. *See Milkovich,* 110 S.Ct. at 2703–04 (citing *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008). No issue is presented in this case concerning the standard of proof required for common law malice, and we express no opinion on it.

S.E.2d at 854, and *supra* note 18; *see Moss*, 580 A.2d at 1025–27. Littman testified, and Stanbury's testimony confirmed, that Littman had never supervised, worked with, evaluated, or read an evaluation of Stanbury. Moreover, Littman testified that he had not received information from anyone in particular, let alone anyone who had had a work-related relationship with Stanbury. Littman's sources for his statements to Janes were observations in the company's halls and general office contacts with unnamed third parties, perhaps at "casual lunches" or "project executive meetings" or "over beer on a Friday afternoon." But he could recall none of the conversations or otherwise provide any concrete support for his statements, whether first-hand information or hearsay. Littman admitted that he had no facts to support any of his statements to Janes and that he had never sought to verify the information before giving his evaluation. Littman also testified that he knew Janes wanted to speak with someone who had "interacted" with Stanbury at Sigal, and yet Littman further testified that he did not tell Janes he had never done so. Nor did Littman tell Janes the altogether vague sources of his statements. To make matters worse, according to Janes testimony, Littman told Janes that he had worked with Stanbury on a project.

In short, this is a case of pure "rumor" or "gossip" or "scuttlebutt" conveyed as fact, without any disclaimer or explanation, coupled with Littman's erroneously leading the prospective employer to believe he had worked on a project with Stanbury. Reviewing the evidence in the light most favorable to Stanbury, as we must, we cannot say there was no record basis for the jury to find by clear and convincing evidence that Littman made the statements to Janes with gross indifference or recklessness amounting to wanton and willful disregard of Stanbury's rights under Virginia law. *See Great Coastal*, 230 Va. at 151, 334 S.E.2d at 854, and *supra* note 18; *Moss*, 580 A.2d at 1025–27.

In sustaining the conclusion that Sigal (through Littman) abused the qualified privilege, we do not mean to imply that employers are at serious risk when providing employment references in the normal course of business. Nor are we suggesting that employers, when providing such references, may not rely on information from the employee's co-workers, even when hearsay. Our analysis here is limited to an office gossip situation where the recommender (1) has conveyed information which cannot be traced to anyone with personal knowledge of the employee whose reputation is at stake, (2) has not qualified his statements by disclosing the nebulous source of his information, and (3) has led the prospective employer to believe he has worked on a project with the employee and thus has first-hand information.

Caselaw concerning publication of unconfirmed defamatory rumors supports our conclusion. In *Babb v. Minder*, 806 F.2d 749 (7th Cir.1986), Babb, an employee, was fired for "moon[ing]" another employee and offering sexual favors to another. Minder, a supervisor at the company where Babb worked, went to Babb's immediate supervisor, told him of Babb's behavior, and urged him to fire Babb. Based on Minder's representations, Babb was fired. Babb sued for defamation (among other things). The employer claimed a qualified privilege and argued there was no evidence showing abuse of the privilege. The jury, the District Court, and the United States Court of Appeals for the Seventh Circuit disagreed with the employer. According to the Court of Appeals:

> The evidence adduced at trial indicates that Minder acted with reckless disregard of the truth or falsity of the defamatory statements and thus supports the jury finding of actual malice.... Minder acted on an unconfirmed rumor about the "mooning" incident conveyed to him off-handedly in one telephone conversation....
>
> Once informed of the "mooning" rumor, Minder did not contact plaintiff nor the employee who supposedly witnessed the incident. Minder did not receive any written statement before Babb was fired.... In effect, Minder made no investigation at all despite the seriousness

of the allegations and their great potential for harm.... Minder acted recklessly in not looking into the situation further before defaming Babb.

*Id.* at 756. *See also Cunningham v. Skaggs Co.*, 729 F.2d 1156, 1158 (8th Cir. 1984) (abuse of privilege in reporting employee as thief without investigation, coupled with failure to report employee's side of story); *Lewis v. Equitable Life Assurance Soc'y of U.S.*, 361 N.W.2d 875, 882 (Minn.1985) (abuse of privilege based on former employer's defamatory statement of reason for termination of employment), *rev'd on other grounds*, 389 N.W.2d 876, 890–91 (Minn.1986) (affirming jury's decision that employer abused the privilege); W. PROSSER & W. KEETON, THE LAW OF TORTS § 115 at 835 (5th ed. 1984).[20]

Cases holding there was no abuse of the qualified privilege are easily distinguish-

able. This is not a case, for example, where an employee's supervisor, who has worked directly with the employee, provides a negative reference based on personal experience. *See Scholtes v. Signal Delivery Serv., Inc.*, 548 F.Supp. 487, 495, 497 (W.D.Ark.1982); *Zuschek v. Whitmoyer Labs., Inc.*, 430 F.Supp. 1163, 1166 (E.D.Pa. 1977), *aff'd*, 571 F.2d 573 (3d Cir.1978). Nor is this a case where the reference is based on a careful, thorough investigation, *see, e.g., Rouly v. Enserch Corp.*, 835 F.2d 1127, 1130 (5th Cir.1988); *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380, 390–91 (5th Cir.1987), or on the employee's own admission, *Arsenault v. Allegheny Airlines, Inc.*, 485 F.Supp. 1373, 1380–81 (D.Mass.1980), *aff'd*, 636 F.2d 1199 (1st Cir. 1980), *cert. denied*, 454 U.S. 821, 102 S.Ct. 105, 70 L.Ed.2d 93 (1981).[21]

**20.** Prosser and Keeton note:

Certainly no reasons of policy can be found for conferring immunity upon the foolish and reckless defamer who blasts an innocent reputation without making any attempt to verify his statements; but on the other hand there are occasions on which it may be entirely proper to give information of a rumor or a mere suspicion, as such, without any belief or any reason to believe that it represents the truth. Probably the best statement of the rule is that the defendant is required to act as a reasonable person under the circumstances, with due regard to [1] the strength of his belief, [2] the grounds that he has to support it, and [3] the importance of conveying the information.

W. PROSSER & W. KEETON, THE LAW OF TORTS § 115 at 835 (5th ed. 1984) (footnote omitted).

Prosser and Keeton's criteria support affirmance here. This is a case of a "reckless defamer." *Id.* Littman premised his defamatory statements on rumor but did not identify his source "as such." *Id.* He accordingly conveyed an impression of fact; he did not qualify the significance of his message by identifying the source as rumor or gossip. As to Prosser and Keeton's first criterion for determining whether Littman acted reasonably under the circumstances, "the strength of his belief," we conclude that because office gossip was the source of his information, Littman's belief presumably could not have been strongly held. The second criterion also cuts against a qualified privilege on this record. Littman provided no basis from which he could support his statements to Janes. Finally, the "importance of conveying the information" was not critical, particularly because Littman could have directed Janes to someone

else at Sigal who supervised or at least worked with Stanbury.

**21.** Sigal especially relies on *Dwyer v. Smith,* 867 F.2d 184 (4th Cir.1989). *Dwyer,* too, is inapposite. In *Dwyer,* an ex-police officer sued her former employer for libel (among other things) based on office memoranda falsely accusing her of lying and committing perjury. *Id.* at 195. The trial court directed a verdict for the employer because there was no evidence of actual malice; the United States Court of Appeals for the Fourth Circuit affirmed. The court ruled the qualified privilege applied because the defendant's method of gathering the allegedly defamatory material

followed careful investigations by the department which were prompted by [plaintiff] herself. The allegations of her untruthfulness and possible perjury were worded as opinions and were substantiated by specifics. Additionally, the communications were limited to the appropriate personnel, further indicating a lack of actual malice.

*Id.* at 195. None of these reasons supports Sigal's position. Littman conducted no investigation, let alone a careful investigation to support his statements. Littman's statements, moreover, were not worded as opinions and were altogether unsubstantiated. Furthermore, Littman's communications were not limited to persons outside Sigal who could not use them to hurt Stanbury. To the contrary, Littman made the defamatory remarks to someone outside Sigal who acted on them in a way that a jury could, and did, find damaged Stanbury. Finally, Littman did not qualify his statements by disclosing they were founded on rumor. *Dwyer* accordingly provides no support for the proposi-

On this record, therefore, the jury could find wanton, willful, or reckless conduct that amounted to abuse of the qualified privilege.

## V. SCOPE OF EMPLOYMENT

■ Sigal contends that even if Littman's statements were defamatory and not privileged, Sigal cannot be held liable because the statements were not made within the scope of Littman's employment. Stanbury replies that Sigal was properly found liable on the theory of *respondeat superior* because, at the time of the statements, Littman was in fact acting within the scope of his employment. *See Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C.1986); *Kensington Assoc. v. West*, 234 Va. 430, 431, 362 S.E.2d 900, 901 (1987). The idea underlying *respondeat superior* liability is that an employer should be held legally responsible for whatever an employee does "in virtue of his employment and in furtherance of its ends." *Penn Central Transp. Co. v. Reddick*, 398 A.2d 27, 29 (D.C.1979) (citation omitted).

■ Apparently, to instruct the jury on scope of employment, the trial court relied on District of Columbia law, see *ante* Part II., that Stanbury was required to prove Littman's statement "was foreseeable as being within the range of responsibilities entrusted to the employee." *See Johnson v. Weinberg*, 434 A.2d at 408.[22] The employer has the burden of proving that the employee was not acting within the scope of employment. *Kensington*, 234 Va. at 431, 362 S.E.2d at 901. "[I]f the evidence leaves the question in doubt it becomes an issue to be determined by the jury." *Id.* Thus, scope of employment becomes a question of law for the court only if there is insufficient evidence from which a reasonable juror could find the action came within the scope of employment. *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C.1984).

### A. Express or Implied Authority

There was evidence at trial, viewed in the light most favorable to Stanbury, from which a reasonable jury could conclude that Littman was acting within the scope of his employment. The essence of scope of employment is the agent's authority from the employer to act as alleged. *See Presley v. Commercial Credit Corp.*, 177 A.2d 916, 918 (D.C.1962). Authority can be proved in several ways. 1 RESTATEMENT (SECOND) OF AGENCY § 26 (1958). Most directly, Stanbury could have shown that Sigal expressly authorized Littman to provide employment references for former employees. There is little if any record evidence to support express authorization.[23]

A showing of express authority, however, is only one method of proving conduct within the scope of employment. *See Presley*, 177 A.2d at 918. Stanbury also could do so by proving implied authority.[24] "Im-

---

tion that Stanbury failed to prove common law malice.

**22.** Under Virginia law, in order to prove an act is within the scope of employment, a plaintiff must demonstrate that

(1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisedly, with a view to further[ing] the master's interests, *or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business* and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his [or her] own account.

*United Bd. of Carpenters & Joiners of Am.*, 203 Va. at 787, 127 S.E.2d at 102 (emphasis in original) (citation omitted).

**23.** Pamela Heiber, Sigal's personnel manager, testified that Sigal's "unwritten" policy was to provide employment references for former employees through Sigal's personnel department and that Sigal's written policy limited disclosure of information on current employees. Littman testified that he was unaware of those policies and would not have provided a reference if he had known this was the policy and his job depended on it, even though the industry standard would have permitted his giving such references.

**24.** Sigal argues that the trial court erred in instructing the jury, over objection, that Sigal could be liable for Littman's statement under theories of implied and apparent authority. Sigal contends that the evidence is insufficient, as a matter of law, to sustain the trial court's charge and, therefore, that the court abused its discretion in so instructing the jury. Because

plied authority is actual authority inferred from the circumstances, such as the relationship between the parties and conduct of the principal toward the agent manifesting the principal's consent to have the agent act for him." *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 669 (D.C.1983) (quoting W. SEAVEY, AGENCY, § 8, at 11–13 (1964)). Implied authority, therefore, exists when the act of "the servant or agent is incidental to authorized conduct and furthers the master's business. A servant or agent is authorized to do anything which is reasonably regarded as incidental to the work specifically directed or which is *usually done in connection with such work.*" *Presley*, 177 A.2d at 918 (emphasis added). Accordingly, there is no difference in legal effect between express and implied authority. W. SEAVEY, § 8, at 12. To prove express authority, Stanbury would have had to show that Sigal provided Littman with specific authorization (you may give employment references); to demonstrate implied authority, Stanbury would have had to prove that Littman was entitled to draw an inference from his particular employer-employee relationship ("project executive" responsibilities implicitly included providing employment references). *See* W. SEAVEY, § 8, at 12. In either case, the employee can be said to have actual authority.

▮ The evidence was sufficient to support a reasonable jury finding that Littman had implied authority to give employment references and was acting within the scope of his employment. Janes testified that a former Sigal project executive, David Orr, had suggested he call Littman, a current Sigal project executive, for Stanbury's employment reference. Orr's suggestion, coming as it did from a former Sigal employee who had held the same position as Littman, indicates, circumstantially, that Orr believed it proper for Sigal project executives to provide employment references for former employees. Moreover, Littman himself testified that "I felt my duties as a construction manager in the Washing-

ton marketplace might have me give job reference[s]." He added that "when it is time to hire an employee, I think it's other managers' responsibility when they can—I thought at the time anyway—that they should respond freely when called...." Littman believed that, as a project executive, he was in a position to provide employment references: "[I]t had been my experience in the industry that you gave references when you could, when people called." Contrary to Sigal's argument to this court, Littman testified that at no time had anyone at Sigal instructed or advised him not to provide references for former employees. *See supra* note 23. Indeed, the facts presented at trial seem to fit squarely within the definition of implied authority in the seminal treatise:

> Where a person is appointed to a recognized position such as the president or manager of a corporation, or the cashier of a bank, or is given a specific authority in general terms ... he [or she] is thereby given authority to do the various matters which by business custom such persons normally have....

W. SEAVEY, § 8, at 12–13.

In sum, as the trial court properly held, the jury reasonably could find that Littman's reference was "foreseeable as being within the range of responsibilities entrusted to the employee," *Johnson v. Weinberg*, 434 A.2d at 408, and that his actions therefore come within Sigal's scope of employment.

### B. *Apparent Authority*

The trial court also gave the jury an instruction on apparent authority. Because the jury could have relied on this approach and Sigal challenges the propriety of the instruction, *see supra* note 24, we must evaluate its legal merit. In contrast with implied authority, apparent authority is derived from the principal's representations to the *third-party* rather than to the agent. *Lewis*, 463 A.2d at 670 n. 7; W. SEAVEY, § 8, at 13. "Apparent authority arises when a principal places an agent 'in

---

we *find there was* sufficient evidence from which a reasonable jury could have found Litt-

man acted with implied or apparent authority, there was no error.

a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold.' " *Feltman v. Sarbov,* 366 A.2d 137, 139 (D.C.1976) (quoting *Drazin v. Jack Pry, Inc.,* 154 A.2d 553, 554 (D.C.1959)). Critical to apparent authority, therefore, is the third-party's perception of the agent's authority. *Livingston v. Fuhrman,* 37 A.2d 747, 748 (D.C.1944); 1 RESTATEMENT (SECOND) OF AGENCY § 27 at 103 (1958). One important method of testing that perception is by reference to the customary practice of other agents in similar situations. *See Management Partnership, Inc. v. Crumlin,* 423 A.2d 939, 941 (D.C. 1980); *Livingston,* 37 A.2d at 748. As the RESTATEMENT (SECOND) OF AGENCY notes:

> Thus, a manager has apparent authority to do those things which managers in that business at that time and place customarily do, as to persons who know that he is a manager, although they do not know what powers managers in such a business have. In such cases the manifestation is interpreted as meaning that the agent has the powers which such managers have, and those dealing with him are entitled to rely upon this as to the extent of the agent's authority, even though they do not know the powers of such managers.... This result is consistent with the interpretation of authority ... and with the interpretation of an offer which, in absence of other evidence, is interpreted in light of the business usages of the community.

*Id.* § 27 at 105–06. The issue of apparent authority presents a question of fact for which the plaintiff has the burden of proof. *Feltman,* 366 A.2d at 140.

■ There is considerable evidence of record to support Stanbury's contention

that Littman was acting with apparent authority. Janes relied on Orr's recommendation to call Littman. Orr was a former Sigal employee with the same level of responsibility as Littman then had. Janes knew Littman was a Sigal project executive. Finally, as Littman repeatedly testified, according to industry standards someone in his position commonly—and appropriately—provided employment references. Accordingly, there is ample evidence from which to conclude that a reasonable juror could find Janes reasonably believed Littman spoke with authority on Sigal's behalf.

## VI. CORPORATE AUTHORIZATION OR RATIFICATION

■ Sigal next contends that, under Virginia law, it cannot be held liable for Littman's statements to Janes unless Sigal either authorized or later ratified those statements. *See Oberbroeckling v. Lyle,* 234 Va. 373, 378, 362 S.E.2d 682, 687 (1987) (dictum). Sigal says the trial court accordingly erred in failing to give a jury instruction, commonly called a "corporate malice" instruction, to that effect. Sigal adds that the evidence does not support a finding of corporate authorization or ratification.

■ On appeal, the parties dispute whether Virginia law requires corporate authorization or ratification for compensatory, as well as punitive damages—as dicta in *Oberbroeckling* suggests [25]—or, instead, corporate authorization or ratification is required only for a claim for punitive damages (which is not presented in this case).[26] Given the context of the suspect language, we conclude that the *Oberbroeckling* dicta should not be read to overturn years of precedent, and good policy, limiting the corporate authorization or ratification requirement to claims for punitive damages. *See*

**25.** The pertinent language is: "And, in connection with a qualifiedly privileged defamatory communication, corporations may be liable for compensatory and punitive damages if the agent's malicious conduct either was authorized by the principal or subsequently was ratified by it." *Oberbroeckling,* 234 Va. at 378, 362 S.E.2d at 687.

**26.** Punitive damages are penal in nature and are designed to punish a knowing wrongdoer. Au-

thorization or ratification is necessary to be certain that punishment is directed at a knowing, not an unwitting employer. *Safeway Stores v. Gibson,* 118 A.2d 386, 388 (D.C.1955); *see Woodard v. City Stores,* 334 A.2d 189, 191 (D.C. 1975). Compensatory damages, on the other hand, serve to compensate the victim, with little, if any, attention paid to the intention behind the negligent action.

*W.T. Grant Co. v. Owens*, 149 Va. 906, 908, 141 S.E. 860, 862 (1928) (quoted with approval in *Oberbroeckling*, 234 Va. at 378, 362 S.E.2d at 687); *Hines v. Gravins*, 136 Va. 313, 318, 112 S.E. 869, 874 (1922), *cert. denied*, 265 U.S. 583, 44 S.Ct. 458, 68 L.Ed. 1191 (1924).[27]

Even other cases on which Sigal relies support the view that corporate ratification or authorization is necessary only to support claims for punitive damages. *See Woodard v. City Stores Co.*, 334 A.2d 189, 191 (D.C.1975); *May Dep't Stores Co., Inc.*, 314 A.2d at 770; *Safeway Stores v. Gibson*, 118 A.2d 386, 388 (D.C.1955). In sum, the *Oberbroeckling* dicta is not adequate support for appellant's position.

## VII. REMITTITUR

 In his cross-appeal,[28] Stanbury challenges the trial court's order that he accept a remittitur from $370,400 to $250,000 or else face a new trial on damages.[29] A trial court has discretion to grant a remittitur, *see City Stores Co. v. Gibson*, 263 A.2d 252, 252 (D.C.1970), and we may reverse only for abuse of that discretion. *See Taylor v. Washington Terminal Co.*, 133 U.S. App.D.C. 110, 112–13, 409 F.2d 145, 147–48, *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969). A remittitur is justified if the verdict is so large that "it is beyond all reason or is so great as to shock the conscience." *Phillips v. District of Columbia*, 458 A.2d 722, 724 (D.C.1983) (citations and internal quotes omitted). The verdict, therefore, must be so large as to indicate the jury was swayed by passion,

prejudice, corruption, or other improper influences or considerations. *See Louison v. Crockett*, 546 A.2d 400, 403 (D.C.1988); *Weinberg*, 518 A.2d at 994.

 Stanbury first challenges the remittitur order on the ground that the jury verdict was not excessive in light of damage to his career. The trial court concluded, however, that although Stanbury claimed damages for a six year early retirement, the evidence did not support a finding of any nexus between Sigal's conduct and Stanbury's retirement.[30] The court ruled that, absent such a causal relationship, Sigal could not properly have been found liable for damages attributable to that extended period. On this record we agree: if the jury had a full six-year period of lost earnings in mind, based on Stanbury's assertions and on the scant evidence to that effect at trial, that perception would have unduly inflated the verdict.

The jury, however, may have relied on Stanbury's emotional injury to allocate damages in excess of the two years of lost earnings the trial court found justifiable. See *supra* note 30. The trial court ruled, however, that, even though there was sufficient evidence for a jury to find Stanbury suffered mental anguish from Sigal's conduct, the verdict award was " 'so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate' " (quoting *Phillips*, 458 A.2d at 724). We see no reason on this record to disturb the court's ruling that, on the basis of demon-

27. *Oberbroeckling* cites *Sun Life Assurance Co. v. Bailey*, 101 Va. 443, 450, 44 S.E. 692, 694 (1903), to require corporate authorization or ratification of compensatory damage. *Oberbroeckling*, 234 Va. at 378, 362 S.E.2d at 687. *Sun Life* only stands for the proposition that corporate authorization applies to punitive damage cases. In *Sun Life*, the court ruled only on punitive, not on compensatory, damages: jurors "could not give punitive or exemplary damages unless they believed from the evidence that the alleged libel of the agent was either authorized by the defendant, or was subsequently ratified by it. ..." 101 Va. at 450, 44 S.E. at 694.

28. In this jurisdiction, contrary to Sigal's contention, Stanbury is entitled to cross-appeal the

order for remittitur even though he accepted the remitted amount in lieu of a new trial for damages where, as here, the defendant appeals the judgment on other grounds. *See Doe v. Binker*, 492 A.2d 857, 862–63 (D.C.1985).

29. Sigal contends, to the contrary, that even $250,000 exceeds the bounds of the evidence and should be further reduced. On this record the argument has no merit.

30. The trial court found evidence of only two years of damage for loss of earnings. The court found, more specifically, that plaintiff's income would have been $101,063.00 for two years, set off by $15,777.00 for amounts Stanbury earned elsewhere during this period, for a total of $85,286.00.

strated emotional suffering and lost earnings attributable to Sigal, Stanbury's damages did not exceed $250,000.

Finally, Stanbury advances a technical point: the trial court erred in equating the reduced award with the amount of damages he claimed in his pretrial papers. The trial court stated:

> In his pre-trial statement, he asserted that he was seeking compensatory damages in the amount of $210,000.00. The court considers the reasonable range in this instance as not to exceed $250,000.00 as it is clear that after careful evaluation, plaintiff himself did not consider his damages to exceed this amount.

The trial court, however, qualified its statement in a footnote: "The court is not implying that it is not sustaining the jury's award merely because the ad damnum clause is only $250,000.00 but because the evidence does not support an award which exceeds that amount." We therefore cannot sustain Stanbury's argument.

In sum, the trial court, in granting the remittitur, correctly identified the factors a jury could take into account in assessing damages: Stanbury's career damage, *see Moss*, 580 A.2d at 1036, and his mental anguish attributable to the effect of Littman's statements. On this record, and in light of the trial court's vantage point from which to evaluate the nuances that guide a jury's impressions (*e.g.*, witness credibility), we cannot say the court abused its discretion in granting the remittitur.

*Affirmed.*